**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MARBLES HOLDINGS, LLC, et al., | ) | Case No. 17-3309 |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |
| | ) | Honorable Timothy A. Barnes |
| | ) | |

**DECLARATION OF GIRISHA CHANDRARAJ IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS**

I, Girisha Chandraraj, under penalties as provided by law pursuant to 28 U.S.C. § 1746, hereby certify that the following is true and correct to the best of my knowledge, information and belief (the "**Declaration**"):

1.      I am the Chief Executive Officer of Marbles Holdings, LLC ("**Holdings**"), Marbles LLC ("**Marbles**"), and Marbles Brain Workshop, LLC ("**Workshop**," and together with Holdings and Marbles, the "**Companies**" or the "**Debtors**")[1].  I am also a member of the Board of Managers of Holdings.

2.      On February 3, 2017 (the "**Petition Date**"), each of the Companies filed a voluntary case under chapter 11 of the Bankruptcy Code in the above-referenced court (the "**Chapter 11 Cases**").  The Chapter 11 Cases are related and this Declaration is being filed in each of the Chapter 11 Cases.  The filing of the Chapter 11 Cases was authorized unanimously by the Board of Managers (the "**Board**") of Holdings.  The Board is comprised of Gavin Cuneo, Vanessa Rollings and me.   Holdings is also sole member and manager of Marbles and Workshop.

---

[1] References herein to the Companies or the Debtors are intended to apply to Holdings, Marbles and/or Workshop, as the case may be.

3.     I am very familiar with the Companies' prior and current day-to-day operations, business affairs, and books and records.  I work closely with Michael Smith, the Companies' Chief Financial Officer and Chief Operating Officer; and Scott Brown, the Companies' Chief Merchant.  Together Messrs. Smith and Brown and I comprise the management of the Companies.

4.     I am familiar with the Companies' prior restructuring efforts and the events leading to the chapter 11 filings; the existing senior secured indebtedness of Amzak Capital Management, LLC ("**Amzak**") and junior secured indebtedness of AMPR Marbles Investors, LLC ("**AMPR**")[2]; the proposed debtor-in-possession (DIP) financing from Amzak; the Companies' cash management system and employee wages, healthcare and other benefits; the gift card and existing customer programs; the Companies' existing tax obligations; and the Companies' proposed liquidation, marketing and sale efforts, all of which are the subjects of the various "first-day motions" filed in the Chapter 11 Cases (collectively, the **"First-Day Motions,"** and individually, a "**First-Day Motion**")[3] and motions to be filed in the first several weeks of the Chapter 11 Cases.  As a result of my familiarity with these matters, as well as my personal experience with the Companies and my more than twenty years of business experience, I have formed opinions regarding the necessity for the relief sought in the First-Day Motions, especially to the extent that such relief will enable the Companies to continue to operate in the ordinary course of business as they pursue a dual strategy of orderly liquidation of substantially all inventory coupled with the marketing and sale of the Companies' intellectual property related to their e-commerce and wholesale business (the "**Intellectual Property**").

---

[2] As discussed further below, Amzak and AMPR hold indirect or direct membership interests in the Companies.
[3] Any capitalized terms not expressly defined herein shall have the meaning ascribed to that term in the relevant First-Day Motion.

5.      I have been authorized to, and hereby submit this Declaration in support of the First-Day Motions described below, as well as other motions and applications that the Debtors expect to file in the first several weeks of the Chapter 11 Cases.  Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents and records of the Companies, and/or my opinion based upon my experience and knowledge of the Companies' operations and financial condition.  If I am called upon to testify, I can and will testify to the facts and matters set forth herein.

## I.      **PRELIMINARY STATEMENT**

6.      Based in Chicago, Illinois, the Companies are a developer, wholesaler and specialty retailer of games, puzzles, books, and software designed to strengthen and stimulate the brain.  The Companies attract a range of customers – from parents searching for "smart toys" for their elementary school-age children to adults looking for ways to keep their memory sharp.  Doing business as "Marbles: The Brain Store," the Companies currently operate thirty-seven (37) retail stores ("**Retail Stores**," and each, a "**Retail Store**") in thirteen (13) states.  They also operate a distribution warehouse in Schiller Park, Illinois, and rent space in a public warehouse in Roselle, Illinois on a seasonal basis.  During the 2016 holiday season, the Companies also operated a store-in-store concept within six (6) Macy's department store locations.  In addition, the Companies maintain significant e-commerce and wholesale channels. Despite years of popularity, the Debtors have faced significant operational challenges—including declining mall traffic and lower-than-projected sales—resulting in substantially lower earnings than anticipated during the most recent holiday season.

7.      The Debtors are not alone in their struggles. In recent years, numerous retailers have filed for chapter 11 protection – some more than once – including American Apparel,

Aeropostale, Pacific Sunwear of California, Sports Authority, and RadioShack.  It is likely that other retailers may commence chapter 11 cases in the near term. The Debtors have faced many of the same challenges concerning the retail industry as a whole, including declining mall traffic, decreased sales, and expensive leases, and an increased consumer emphasis on internet-based retail.

8.      Despite optimism that 2016 holiday sales would buck what has been a general downward trend in retail sales, ultimately the Companies fell short.  Consequently, they now find themselves faced with significant ongoing expenses and an ever-dwindling reserve of funds from which to pay them.

9.      The Debtors have at all times been mindful of their commitments to their creditors and their obligations to preserve and maximize value.  In light of the Companies' limited cash availability coming into 2017, they have taken several dramatic steps to maximize the value of the Companies' assets, including:

- Minimizing operating costs;

- Canceling orders of new inventory;

- Undertaking a 50% reduction in the workforce at their corporate headquarters;

- Closed three stores that were operating at a loss – two upon the ordinary lease terminations and one in cooperation with the landlord;

- Negotiating with the Companies' senior secured lender for sufficient financing to effectuate the disposition of the Companies' assets in a chapter 11 in order to maximize the sale value of those assets;

- Retention of an experienced liquidator, Gordon Brothers Retail Partners, LLC, to effectuate the orderly liquidation of substantially all inventory and closure of the Retail Stores as expeditiously as possible[4]; and

---

[4] The Debtors reserve the right to assume and assign Retail Store leases to the extent any potential buyers of the Debtors' Intellectual Property express interest in maintaining any Retail Stores.

- Retention of an experienced investment banker, Hilco Streambank, to market and consummate the sale of the Debtors' Intellectual Property.

10.     Thus, in January 2017, with a lack of new inventory and a fixed liquidity runway, the Debtors began taking steps toward an orderly and efficient liquidation process focused on the twin goals of (a) winding down their brick-and-mortar operations while (b) exploring interest in a sale of the Companies' remaining assets by whatever means would produce the greatest recovery.

11.     I believe that time is of the essence if the Debtors are to fully capitalize on the disposition of their assets.   After lengthy negotiations with the Debtors' prepetition secured lenders, Amzak and AMPR, the Debtors were able to secure $900,000 in postpetition financing and use of cash collateral with a view toward an orderly sale process.   At the same time, I anticipate, based on projections prepared by the Debtors' management team, that the administrative expenses of the Chapter 11 Cases will be approximately $300,000 per month. Moreover, the expeditious sale of the Debtors' inventory is critical to minimize the expense of maintaining dozens of Retail Stores during the liquidation process.   Finally, the value of the Debtors' remaining assets will only decrease over time, thereby necessitating a thorough but efficient marketing and sale process.

12.     For all of these reasons, the Debtors' ability to maximize value for the benefit of their creditors is dependent on their ability to quickly and efficiently proceed with an orderly liquidation and asset sale.

13.     To familiarize the Court with the Debtors, their business, the circumstances leading to the Chapter 11 Cases, and the relief the Debtors are seeking in the First-Day Motions, this Declaration is organized as follows: Part II of this Declaration describes the business of the

Debtors, their debt structure and the circumstances surrounding the filing of the Chapter 11 Cases. Part III sets forth the relevant facts in support of the Companies' First-Day Motions, and the documents filed concurrently therewith. Part IV provides information with respect to certain additional pleadings that will be filed in the beginning of the Chapter 11 Cases, for which the Debtors will not seek immediate entry of an order.

## II.   BACKGROUND

### A.   Marbles LLC

14.     Founded in 2008, Marbles is a privately held limited liability company organized and existing under the laws of the State of Illinois. Its principal place of business and principal office are located at 1918 North Mendell Street, Chicago, Illinois ("**Headquarters**"). Marbles was the original operating company of the Debtors. In May 2011, Marbles Holdings, Inc. was formed. The members of Marbles contributed their membership interests to Marbles Holdings, Inc., pursuant to which Marbles became a wholly owned subsidiary of Marbles Holdings, Inc. Marbles Holdings, Inc. (later Marbles Holdings, LLC) assumed responsibility for business operations. Today, Marbles continues to be the signatory on several leases and other agreements but most business operations are conducted by Holdings.

### B.   Marbles Holdings, LLC

15.     Founded in 2011, Holdings was originally formed as a privately held Delaware corporation.[5]  In November 2014, Holdings converted to a privately held limited liability company organized and existing under the laws of the State of Delaware. Its principal place of business and principal office are located at Headquarters. Holdings is both the parent company of Marbles and Workshop, and the principal operating company of the Debtors.

---

[5] A description of Holdings' conversion from corporation to limited liability company is described in Section II.G.3 below.

16.    While the Companies are separate corporate entities, they are an integrated business both from an accounting and operational standpoint.

### C.    <u>Marbles Brain Workshop, LLC</u>

17.    Founded in 2016, Workshop is a privately held limited liability company organized and existing under the laws of the State of Delaware.  Its principal place of business and principal office are also located at Headquarters.  Workshop is wholly owned by Holdings.

### D.    <u>Nature of the Business</u>

18.    The Companies engage in the development, curating, wholesaling and retail sale of unique brain-stimulating games, puzzles, software, and books.  They offer brain-building products, such as critical thinking, memory, coordination, visual perception, and word-skills products, as well as gifts.

19.    Since the founding of Marbles in 2008, the Companies have followed one mission: "Build Better Brains." The premise was based on compelling research demonstrating the brain's ability to adapt and improve at any age.  The Companies offer approximately 250 products in their Retail Stores and over 400 online assorted under the following nine (9) categories, described as follows:

- <u>Party Brains</u>:  Games intended for group play.
- <u>Strategy Brains</u>:  Games focused around building critical thinking skills.
- <u>Maker Brains</u>:  Games and toys focused on capturing the engineer in everyone.
- <u>Active Brains</u>:  Games and toys focused on active play.
- <u>Puzzle Brains</u>:  Games and toys focused on problem-solving skills.
- <u>Designer Brains</u>:  Games and toys focused on unlocking creativity and imagination.
- <u>Know Brainers</u>:  Toys built for "fidgeters".
- <u>Tech Brains</u>:  Toys that bridge the physical and digital spaces.
- <u>Marbles Junior</u>: Games and toys intended for those under the age of five.

20.     Concepts for proprietary products come from the Companies' own employees and from outside game inventors, which are then developed through Workshop.[6]  In a typical year, the Companies consider thousands of ideas for new products, with approximately twenty (20) making it to production and sales.  Over the years, the Companies have launched hundreds of proprietary products.

21.     The Companies sell both third-party and Marbles-branded products:

- **Third-Party Products**: These are products sold under a third party's brand for which the designs and trademarks are owned by the third party.  Generally, these products are not exclusive to the Companies and may be available through a number of retailers and e-commerce competitors.  In 2016[7], third-party products accounted for approximately 65% of sales, or $17.9 million.

- **Marbles-Branded Products**: These are products that are packaged under the Marbles brand and labeled with the Marbles logo.  In 2016, the Companies carried 141 Marbles-branded products, which accounted for approximately 35% of sales, or $9.85 million.  The Marbles-branded products can be segmented into four main categories:

  o  Owned Games: These products are fully owned and controlled by the Companies. These products have either been developed internally or their designs and trademarks have been acquired by the Companies from the original inventor or previous owner. The distribution of these products is controlled directly by the Companies so that the products can only be found in the Companies' stores. In 2016, the Companies carried 29 owned games which accounted for approximately 10.3% of total revenue, or $2.86 million.

  o  Original Equipment Manufacturer (OEM): These products' designs and trademarks are owned and manufactured by third parties. The relationship with the OEM vendors is very similar to the suppliers of third-party products, except that game owners have agreed to allow the product to be carried under the Marbles brand name. While the products are typically not exclusive to the Companies, the Marbles branding conveys a certain level of exclusivity to the consumer and helps alleviate comparison shopping. In 2016, the Companies

---

[6] Prior to the founding of Marbles Brain Workshop, LLC in 2016, product concepts were developed through the Companies in what was referred to internally as the "Marbles Brain Workshop," with products trademarked as such.
[7] The Companies operate on a fiscal year ending the Saturday closest to January 31. Unless otherwise noted, monetary figures herein for 2016 are year-to-date through December 31, 2016.

carried 86 OEM games which accounted for approximately 8.7% of total revenue, or $2.4 million.

o   Licensed: These are game or toy designs that have been created by a third party that has agreed to license the concept to the Companies, to be sold under the Marbles brand, on an exclusive basis in exchange for a royalty payment. The license agreement typically gives the Companies the exclusive right to manufacture and sell products based on the licensed designs. The Companies currently license 19 products from designers for royalties which range from 2.5% to 7%. In 2016, the Companies carried 19 licensed games which accounted for approximately 12.6% of total revenue, or $3.57 million.

o   Public Domain: Works in the public domain are those whose intellectual property rights have expired. Public domain products are products that were not created or invented by the Companies. They are products that are based on concepts that are generally available in the public domain. In 2016, Marbles carried 7 public domain games which accounted for approximately 3.9% of total revenue, or $1.1 million.

22.   The Companies sell their products across a variety of platforms, including:

•   Retail: The Companies opened their first Retail Store in 2008, and by 2009 had 3 stores in the Chicago area. The Companies expanded to include, at their peak, 40 Retail Stores[8] in 13 states. Retail Stores are currently located in California, Delaware, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Ohio, Pennsylvania, South Carolina and Washington.

The Companies generally focus their stores in tourist and regional malls. Regional malls are shopping malls designed to service a larger area than a conventional shopping mall. They typically have 400,000 to 800,000 sq. ft. gross of leasable area with at least two anchor stores and a wide selection of stores. Tourist malls are similar in size and composition to regional malls, but instead of serving wide areas, tourist malls are centered on an attraction that drives customer traffic. Such attractions can be adjacent to a vacation area or a busy city center.

In 2016, 21 of the Companies' then-40 Retail Store locations were profitable or approximately break-even on a "four wall" basis (i.e., before corporate expenses). In 2016, the Companies' Retail Stores accounted for 77.8% of total revenue, or approximately $21.6 million.

•   Store-in-Store: In November 2016, the Companies began operating a store-in-store (SIS) concept within six Macy's department store locations for the holiday season. Three of these locations were also utilized for the 2015 holiday season. The six SIS locations were open only through the first week of January 2017. In

---

[8] The Companies currently have 37 Retail Stores.

2016, the SIS locations accounted for .9% of total revenue, or approximately $260,000.

- E-commerce: The Companies designed their website, www.marblesthebrainstore.com, in 2013 to support the ongoing growth and enhance profitability  The Companies carry over 400 items on their website, many more than they carry in Retail Stores, allowing customers access to a much larger and more varied assortment. The Companies have created and linked over 180 "how-to-play" videos on their website to mirror as much as possible the interactive experience of the stores.

  Reflecting the growing importance of their e-commerce business, the Companies implemented a variety of website upgrades, including a complete redesign of the homepage and navigation, a simplification of the checkout process, the addition of a UPS shipping estimator, and the addition of gift genius functionality to assist customers in finding the right gift.

  In 2016, e-commerce accounted for 11.7% of the Companies' total revenue, or approximately $3.3 million.

- Catalog: The Companies launched their first catalog in November 2013, with 475,000 mailings.  The Companies rent their mailing lists from a catalog company; however, the Companies have acquired their own list of approximately 157,000 addresses after filling catalog orders for these customers.  The catalog was designed to drive both web and store traffic. It has the dual purpose of not only bolstering the Marbles brand but also increasing awareness of the Companies' branded product offerings. The Companies produced two catalogs in 2016, reaching approximately 400,000 customers during the 2016 holiday season.

- Wholesale: Along with e-commerce, wholesale represents the other fast-growing segment of the Companies' business.  In 2016, Workshop was created to serve the wholesale market for proprietary Marbles-branded products, which currently comprise 30% of the Companies' revenues.  Currently, the wholesale accounts are served through Holdings; it was management's intent to transition these relationships to Workshop in 2017 to distinguish the wholesale business from the retail brick-and-mortar and e-commerce business segments.

  In 2016, the wholesale channel generated approximately $2.9 million in sales, primarily from Target Corporation.  Target is currently offering four Marbles-branded products in its stores and has a commitment to sell products through the end of calendar year 2017. The remaining sales have come from iWorld Australia, Amazon, and distributors in Europe.

### E.    Location of the Business

23.     As noted above, the Debtors currently maintain 37 retail stores located in mall

locations throughout the country.   A breakdown of the Retail Store locations, all of which are

leased by the Companies, is as follows:

| **Mall Name** | **City** | **State** | **Tenant**[9] |
|---|---|---|---|
| Topanga | Canoga Park | CA | Marbles |
| Fashion Island | Newport Beach | CA | Holdings |
| Roseville | Roseville | CA | Holdings |
| Stonestown | San Francisco | CA | Marbles |
| San Francisco Center | San Francisco | CA | Marbles |
| Fisherman's Wharf | San Francisco | CA | Holdings |
| Valley Fair | Santa Clara | CA | Holdings |
| Santa Monica | Santa Monica | CA | Marbles |
| Fashion Square | Sherman Oaks | CA | Marbles |
| Del Amo | Torrance | CA | Marbles |
| Christiana | Newark | DE | Holdings |
| Lincoln Square | Chicago | IL | Marbles |
| Water Tower Place | Chicago | IL | Marbles |
| Naperville | Naperville | IL | Marbles |
| Woodfield | Schaumburg | IL | Marbles |
| Old Orchard | Skokie | IL | Marbles |
| South Shore | Braintree | MA | Marbles |
| Natick | Natick | MA | Marbles |
| Northshore | Peabody | MA | Marbles |
| Annapolis | Annapolis | MD | Marbles |
| Montgomery | Bethesda | MD | Marbles |
| Columbia | Columbia | MD | Marbles |
| National Harbor | Oxon Hill | MD | Holdings |
| Towson | Towson | MD | Marbles |
| Somerset | Troy | MI | Holdings |
| Mall of America | Bloomington | MN | Marbles |
| Bridgewater | Bridgewater | NJ | Holdings |
| Menlo Park | Edison | NJ | Marbles |
| Freehold | Freehold | NJ | Marbles |
| Garden State | Paramus | NJ | Marbles |
| World Trade Center | New York | NY | Holdings |

---

[9] Certain leases were entered into by "Marbles Holdings, Inc.", the predecessor to Marbles Holdings, LLC.

| Easton | Columbus | OH | Holdings |
|---|---|---|---|
| Liberty | Liberty Twp | OH | Holdings |
| King of Prussia | King of Prussia | PA | Marbles |
| Myrtle Beach | Myrtle Beach | SC | Holdings |
| Bellevue | Bellevue | WA | Holdings |
| Westlake | Seattle | WA | Holdings |

24.     The Companies' locations also include the following:

- One and one-half floors of office space at 1918 North Mendell in Chicago, Illinois, which comprises the Companies' Headquarters;

- Distribution warehouse in Schiller Park, Illinois, from which inventory is received from the Companies' suppliers and shipped to Retail Stores and e-commerce customers; and

- A public warehouse in Roselle, Illinois, from which the Companies rent space during the holiday season to augment their capacity.[10]

**F.     Employees**

25.     Presently, the Companies[11] employ approximately 333 non-union, full-time and part-time workers.   Sixty-three employees—primarily management and administrative—are salaried, with the balance of employees paid on an hourly basis.   Seventy-five employees are full-time, while the remaining 258 employees are part-time.   Employees are located at Headquarters; the distribution warehouse in Schiller Park; and the Retail Stores.

**G.     Financing and Other Indebtedness Prior to the Chapter 11 Cases**

26.     Over the first six years of their existence, the Companies experienced losses necessitating several rounds of fundraising.   At or about the time of the founding of Holdings in 2011, the Companies raised approximately $9.4 million from 17 investors.   A further investing round was completed in 2012 as warrants from the prior round were exercised for approximately $3.6 million.   The co-founder and CEO of Marbles, Lindsay Gaskins, had contributed both

---

[10] The Companies are not currently renting space in the Roselle warehouse.

[11] All employees, including management, are employed by Holdings, though references herein are more generally to the Companies or the Debtors.

personal funding and solicited investments from a range of parties, including other executives of

the Companies, family members, friends, and venture capital firms.  In addition, in fall 2013, the

Companies obtained a loan through Salus Capital Partners, LLC ("**Salus**") to accommodate the

Company's growing capital needs (the "**Salus Loan**").   Nevertheless, for the thirteen months

ending January 31, 2014, the Companies lost approximately $4.7 million.[12]

### 1.    Need for New Capital in 2014

27.    While prior capital assisted the Companies in their efforts to grow the business, in

2014, the Companies formulated a four-year growth plan that would dramatically expand the

Companies' reach nationally.  Elements of the growth plan would include:

- Opening seventy-five (75) retail store locations;
- Expanding product development capabilities;
- Upgrading the Companies' website for improved marketing, customer experience and analytics;
- Increasing the Companies' catalog efforts through additional mailings and further catalog design refinement;
- Consolidating and improving distribution operations; and
- Augmenting personnel and systems necessary to execute on the Companies' strategies.

28.    In formulating and executing the proposed growth plan, or about December 30,

2013, the Companies retained an investment banker, Consensus Advisors LLC ("**Consensus**").

In 2014, Consensus took the following steps in connection with the Debtors' efforts to raise $15

to $20 million in capital:

- In January and February, Consensus conducted due diligence of the Companies and prepared marketing materials.
- In late February, Consensus initiated marketing calls to potential investors.
- Consensus contacted a total of 126 parties, of which 93 were financial parties and 33 were strategic parties.

---

[12]  The Companies' losses violated the minimum EBITDA covenant under the Salus loan, but Salus waived the covenant violation.

- A total of 44 parties executed NDAs and received the Companies' confidential information memorandum.
- Consensus received two written proposals, with another party providing verbal indications of moving forward.
- After preliminary due diligence, one of the interested parties withdrew, and another only had the financial wherewithal to commit up to $5 million.
- In May, the Companies executed a letter of intent (LOI) with Prentice Capital Management, LP ("**Prentice**").
- After completing the majority of its due diligence in early July, Prentice indicated it was not willing to invest on its own.  Prentice believed that further capital would be needed in the future and wanted to have a partner in place that could provide such capital.
- Prentice subsequently contacted several potential investment partners.
- In early August, a potential partner submitted a term sheet to the Companies.
- In late August, another potential partner, Amzak Capital Management, LLC, presented the Companies with an LOI.
- In light of the competing offers, the Companies' then-Board of Managers established a sub-committee to review the proposals, ultimately determining that Amzak's proposal was superior.
- In early September, the Companies executed an LOI with Amzak, with M&M Marbles, LLC ("**M&M**"), an affiliate of Prentice, acting as co-investor.
- After completing its accounting and operational diligence, Amzak required a revision to the terms of the LOI.  Revised terms were negotiated and agreed to on or about September 19, 2014.

## 2.    The November 2014 Transaction

29.    The closing of the Companies' transaction with Amzak and M&M occurred on November 6, 2014 (the "**Closing**").   In advance of the Closing, Amzak and M&M formed AMPR Marbles Investors, LLC, of which Amzak owns a 90% interest and M&M owns a 10% interest.

30.    The Closing involved two components: (a) the restructuring of what was then Marbles Holdings, Inc.; and (b) the issuance of debt and equity by AMPR.

31.    In connection with the AMPR Loan (defined below), AMPR and the then-existing investors of Marbles Holdings, Inc. entered into a reorganization and conversion agreement. Pursuant to the agreement, Marbles Holdings, Inc. would be converted from a Delaware

corporation into a Delaware limited liability company – what is now known as Marbles Holdings, LLC.

32.     Holdings' reorganization and conversion was entered into in connection with and to effectuate the financing from AMPR, which included issuance of (a) 172,414 Class B units by Holdings to AMPR for $5 million in equity and (b) a $10 million promissory note by Holding to AMPR which is convertible into 344,827 Class C units in Holdings.

33.     The November 2014 reorganization and conversion resulted in M Blocker Corporation[13], a majority shareholder of Marbles Holdings, Inc., becoming a minority member in Marbles Holdings, LLC.  Certain other shareholders of Marbles Holdings, Inc. opted out of the reorganization and conversion, with $1.6 million in Holdings' financing proceeds used to redeem their shares.[14]

34.     In connection with the $10 million in financing from AMPR to Holdings (the "**AMPR First Loan**"), AMPR and/or Holdings[15] executed, among other things: that certain Secured Convertible Promissory Note in the amount of $10 million (the "**AMPR First Note**"); Loan Agreement (the "**AMPR First Loan Agreement**"); Security Agreement (the "**AMPR First Security Agreement**"); Subsidiary Guaranty of Marbles; Subordination and Intercreditor Agreement with Salus; as well as various ancillary documents.

35.     The maturity date of the AMPR First Note is November 6, 2020. The note is convertible into Class C units at the conversion price in effect upon the date of conversion.  Per the terms of the AMPR First Loan, borrowings under the loan bear interest at five percent. Any

---

[13] M Blocker Corporation is owed by Sandbox Ventures, L.P., Marbles founder Lindsay Gaskins, and friends and family members of Ms. Gaskins and other investors.

[14] In addition, approximately $45,000 in proceeds was used to pay off bridge loans previously provided by certain shareholders.

[15] Certain of the loan documents were also executed by Marbles.

interest accrued for the first three years of the AMPR First Note are to be paid in Class C units unless AMPR elects to receive cash payment.  Paid-in-kind interest expense on the note payable was $510,206 and $120,833 during the years ended January 30, 2016 and January 31, 2015, respectively.   Any interest accrued on the AMPR First Note after the first three years are required to be paid in cash upon the maturity date. As of the Petition Date, AMPR had not elected to receive any cash payments for accrued interest.

36.     Under the terms of the AMPR First Security Agreement, the Companies' indebtedness under the AMPR First Loan is secured by substantially all of the assets of the Companies, including "cash collateral" as that term is defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**").   AMPR's security interests were subordinate to the security interests of Salus under the Salus Loan.

### 3.     Senior Secured Loan of Siena Lending Group LLC[16]

37.     In or about August 2015, Salus announced loan losses and management changes that ultimately led to its decision not to renew the Salus Loan and instead accelerate the loan's maturity date to December 31, 2015.  The Companies therefore needed a new working capital lender.

38.     On December 29, 2015, Marbles and Holdings entered into a financing agreement (the "**Siena Loan**") with Siena Lending Group, LLC ("**Siena**"), whereby the Companies had access to a $10 million loan facility.  Proceeds of the Siena Loan were used in part to pay off the Salus Loan.  Under the terms of the Siena Loan, advances to the Companies were based on the Companies' accounts receivable and inventory levels, as well as a seasonal $1 million over-advance guaranteed by AMPR.

---

[16] As explained below, the Siena Loan has since been purchased by and assigned to Amzak.

39.    In connection with the $10 million in financing from Siena to the Companies[17] (the "**Siena Loan**"), Siena, Marbles and/or Holdings executed, among other things: that certain Loan and Security Agreement; Intellectual Property Security Agreement (together with the Loan and Security Agreement, the "**Siena Security Agreements**"); Limited Guaranty and Suretyship Agreement with Amzak and M&M; Subordination and Intercreditor Agreement with AMPR; as well as various ancillary documents.

40.    Pursuant to the Siena Loan, Siena acquired security interests covering substantially all of the Companies' assets and property, including any intellectual property and Cash Collateral.  Pursuant to a subordination agreement between AMPR and Siena, the security interests granted to AMPR are junior to the security interests of Siena.

### 4.    Additional Financing by AMPR

41.    In fiscal-year 2015, the Companies lost $7.6 million but remained committed to their four-year growth plan, which called for the building of five (5) new stores in 2016.  In light of the Companies' need for additional capital entering 2016, the Companies entered into a secured subordinated promissory note agreement with AMPR on or about February 10, 2016, with maximum borrowings up to $5 million[18]. Borrowings under the agreement bear interest at eighteen (18) percent, to be paid upon the maturity date of December 28, 2018. For each $500,000 borrowed under the agreement, the Company issued warrants to purchase 18,500 Class B units of the Company with a cash purchase price of $.01 per unit expiring ten (10) years after issuance.

---

[17] While Marbles is designated as borrower under Siena Loan, Holdings is a co-obligor.
[18] In or about July 25, 2016, the borrowing ceiling increased to $5,150,000, pursuant to my exercise of a $150,000 loan participation.

42.    In connection with the additional $5 million in financing from AMPR to Holdings (the "**AMPR Second Loan**"), AMPR and/or Holdings[19] executed, among other things: that certain Promissory Note in the amount of $5 million (the "**AMPR Second Note**"); Loan Agreement (the "**AMPR Second Loan Agreement**"); First Amendment to Security Agreement; First Amendment to Subsidiary Guaranty of Marbles; as well as various ancillary documents.

43.    The AMPR Second Loan was subsequently amended pursuant to that certain Amended & Restated Promissory Note dated October 27, 2016, whereby the Companies increased their borrowings under the AMPR Second Loan to $5,450,000.  The addition $300,000 was never drawn but was put in place due to cash flow concerns.

44.    As with the AMPR First Loan, AMPR's debt under the AMPR Second Loan is secured by a lien on substantially all of the Companies' assets and property, including Cash Collateral.

**5.    Defaults under the Loans and Assignment of Siena Loan to Amzak**

45.    As explained further below, on or about January 6, 2017, the Companies received a letter from Siena notifying the Companies of certain material defaults under the Siena Loan. As a consequence, Siena terminated its commitment to extend credit under the Siena Loan; demanded payment of certain alleged outstanding obligations under the loan; and applied all funds from the Debtors' Collections Account (defined below) to the asserted outstanding obligations under the loan.

46.    In reaction to the Debtors' defaults under the Siena Loan, or about January 6, 2017, the Companies received a letter from AMPR notifying the Companies of certain material

---

[19] Certain of the loan documents were also executed by Marbles.

defaults under the AMPR First Loan and the AMPR Second Loan (collectively, the "**AMPR Loans**"), with AMPR reserving any and all of its rights under the AMPR Loans.

47.     On or about January 11, 2017, the Siena Loan was purchased by and assigned to Amzak.  By sale and assignment, AMPR's security interests are currently junior to the security interests of Amzak.

### 6.     Total Secured Indebtedness

48.     As of February 3, 2017, the outstanding balance owed by the Companies to AMPR under the AMPR Loans (collectively, the "**AMPR Junior Secured Indebtedness**") is: (a) $11,194,755.50 on the AMPR First Loan, plus attorneys' fees, with default interest accruing at a per diem rate of $2,146.59; and (b) $5,929,840.31 on the AMPR Second Loan, plus attorneys' fees, with default interest accruing at a per diem rate of $3,576.39.

49.     As of February 3, 2017, the outstanding balance owed by the Companies to Amzak under the Siena Loan was $368,932.46 plus attorneys' fees, with interest accruing at a per diem rate of $79.55 (collectively, the "**Amzak Senior Secured Indebtedness**").

### 7.     Other Secured Indebtedness

50.     In addition to the secured indebtedness of Amzak and AMPR, the Companies' secured indebtedness includes a purchase-money-security interest in a forklift.[20]

### 8.     Unsecured Indebtedness

---

[20] It has not yet been determined whether Wells Fargo and/or Alta Equipment Company possess a perfected security interest in the forklift.  Moreover, the Companies' management and counsel are in the process of analyzing the Companies' various contracts and leases, including the forklift agreement(s), to determine, where applicable, (a) if they are true leases or secured financing agreements under the Uniform Commercial Code (UCC), and (b) whether any security interests under such financing agreements are properly perfected under the UCC.  The Companies reserve any and all of their rights with respect thereto.

51.     Collectively, the Companies have a network of nearly 300 regular suppliers, including local, national and international manufacturers, as well as service providers.  The Companies also have over 10 inventors from whom they obtain rights to develop and/or sell certain products.  All told, the Companies currently have an aggregate of approximately 360 trade and other general unsecured creditors (excluding any obligations to employees for prepetition wages and reimbursable business expenses) totaling approximately $6.5 million.[21]

### 9.     Executory Contracts and Unexpired Leases

52.     The Companies are parties to over forty leases and executory contracts in conjunction with their day-to-day operations.  These include[22]:

- Leases for each of their 37 Retail Stores;
- Lease of Headquarters in Chicago, Illinois;
- Lease of distribution warehouse in Schiller Park, Illinois;
- Lease of postage machine;
- Approximately 19 license agreements; and
- Contracts for telephone, internet, freight, and e-commerce services.

### H.     Financial Condition of the Business and Value of the Assets

53.     Since 2012, the combined revenues of the Companies have averaged over $21 million annually.  However, revenues have stagnated since 2014, in spite of the growth in the number of stores, with revenues of $21.7 million in 2014; $28.3 million in 2015; and approximately $29 million in 2016.

54.     The assets of the Companies include the following[23]:

### 1.     Cash

---

[21] Subject to the resolution of claims for leases and executory contracts.

[22] The Debtors are in the process of analyzing the Companies' various agreements for use of personal property to determine if they are executory or non-executory.  Any references herein to "executory" are not intended as a legal determination by the Companies.

[23] Excludes leases and executory contracts.

55.    As of the Petition Date, the Companies have approximately $125,000 in cash, primarily at the individual Retail Stores.

### 2.    Accounts Receivable

56.    As of the Petition Date, the Companies have accounts receivable totaling approximately $110,000, all of which is due to Holdings.  A receivable from Macy's for approximately $55,000 is subject to offset for any product returns, which are not likely to exceed 5% of the $55,000 balance.  Based on historical collections, the Companies are likely to collect more than 90% of the outstanding accounts receivable.

### 3.    Inventory

57.    As of the Petition Date, the Companies collectively own approximately $3.3 million of inventory, nearly all of which is held by Holdings.

58.    Saleable finished goods comprise of approximately $3.2 million of the inventory on hand, with the balance including packaging and uniforms. The Companies expect to generate net revenue totaling approximately $3.5 million from the sale of the inventory through orderly liquidation sales.  The Companies also anticipate selling approximately $240,000 of inventory in conjunction with any sale of the Companies' Intellectual Property.  Based on my understanding of the market for Marbles products and informal discussions with liquidators, if all of the Companies' inventory were liquidated in a "forced sale" context, I believe the net revenues would be substantially less than $1 million.

### 4.    PP&E

59.    As of the Petition Date, the Companies had property, plant and equipment (e.g., leasehold improvements and fixtures) with an aggregate net book value of approximately $4.8.

The estimated market value of these assets will be determined as the Companies proceed through the chapter 11 process.

### 5. Intellectual Property

60.    The Intellectual Property of the Companies includes any of their interests in trademarks, patents, copyrights, domain names, customer lists and data, as well as proprietary content such as game designs, packaging and logos.

61.    The value of the Intellectual Property is not reflected on the balance sheet of the Companies, as the investment in developing these assets was not material under GAAP. However, the market value of the Intellectual Property will be determined in connection with the anticipated marketing and sale of these assets in the Chapter 11 Cases.

### 6. Other Assets

62.    As of the Petition Date, the Companies had prepaid expenses (e.g., insurance) with a total estimated value of $200,000.

63.    As of the Petition Date, the Companies had Other Long-Term Assets (e.g., security deposits) with a total estimated value of $958,000, including unamortized loan expenses of approximately $740,000.

### I.    Events Leading to the Chapter 11 Cases

64.    As noted above in the Preliminary Statement, the factors leading to the filing of the Chapter 11 Cases are myriad, and include both issues specific to the Companies and ones impacting the retail industry generally.

### 1.    Retail Store Expansion Fails to Gain Traction.

65.    The Companies' business, as detailed above, is comprised of the following primary segments: (1) retail stores; (2) e-commerce; (3) catalog; and (4) wholesale.  In or about

November 2014, the Debtors decided on an aggressive strategy to expand the Companies' brick-and-mortar store presence nationally.  In 2015, the Companies opened eight (8) stores (excluding temporary or store-in-store outlets), and in 2016 opened an additional five (5) stores, raising the total number of retail stores to forty (40) (after closing five stores during this period).

66.     At the time I was hired as CEO of the Companies in May 2016, the expansion strategy was near conclusion, with business performing to forecast.  At the same time, management foresaw problems with the expansion strategy given challenges in the retail industry generally, and so the goal shifted to curtailing further Retail Store expansion, which was proving to be too capital intensive.  Instead, the Companies would focus on expanding their e-commerce and wholesale channels, which over the past couple of years have proven to be the fastest-growing segments of the Companies' business.  While the Companies brick-and-mortar business, even on their expanded scale, was largely stable, management and the Board agreed that the Companies' e-commerce and wholesale business needed further attention and focus.

67.     The Companies' performance through the summer of 2016 continued to mostly meet projections, though several of the newly opened Retail Stores were underperforming, including Fisherman's Wharf (San Francisco); Myrtle Beach; and Chicago Premium Outlets (Aurora).  In August 2016, the Companies opened their most expensive location yet, World Trade Center (WTC).  The Debtors believed that the mall owner of WTC could transform the Financial District into an iconic shopping center in Manhattan with significant customer foot traffic, thereby justifying the capital expenditure.

68.     As 2016 continued, the Companies' overall revenues continued to fail to meet projections.  While revenues from the Companies' pre-expansion Retail Stores suffered a minor

decline, the Companies' newest, most expensive stores, including Fisherman's Wharf and WTC, accounted for over 50% of the Companies' sales shortfall.

69.     In addition, the Companies' 2016 budget had projected e-commerce growth of 80% over 2015 (after excluding 2015 sales of a product tied to the "Stars Wars" movie release that year).   By fall 2016, however, it became clear that the Companies' projections for e-commerce, like the expanded Retail Store projections, would never materialize.

70.     Somewhat unique to the Companies' business is the degree to which holiday sales drive the Companies' revenues.   In particular, year-end holiday sales comprise approximately 55% of the Companies' annual revenues and are responsible for generating substantially all of the Companies' cash.   Consequently, the Debtors remained optimistic that 2016 holiday sales would prove sufficiently robust to help them recover from earlier revenue declines.

71.     Management further determined that if the Companies were able to meet holiday sales projections, they would end the year with approximately $4 million in cash.   Instead, the Companies experienced a dramatic downturn in business during the holiday season that left the Companies with insufficient revenues to meet their cash-intensive needs for the first- and second-quarters of 2017.   By the end of December, the Companies had approximately $1.7 million in cash and approximately $6.3 million in accounts payable.

72.     In summary, while there was not a single factor that drove the Companies' poor performance in 2016, several factors clearly played an outsized role:

- Traffic declines to the Retail Stores beginning in September and continuing the rest of the year, including holiday season;

- The assortment of Marbles products failed to produce as many popular hits with consumers as compared to prior years; and

- Perhaps most significantly, the Retail Stores opened as part of the four-year growth strategy materially underperformed, with only 3 out of the 13 newer stores having met projected revenues.

### 2.    The Retail Industry Experiences Upheaval.

73.    As noted above, the Debtors have not been alone in their struggles. In recent years, numerous retailers have filed for chapter 11 protection.  Many have announced store reductions or complete shutdowns, including Macy's (closing 100 stores, laying off 10,000 employees), Kohl's (closing 18 stores), JCrew and Abercrombie & Fitch (repositioning business), and The Limited (250 stores and liquidating).  The broader retail brick-and-mortar landscape is going through a major correction and the Companies, like many other retail businesses, have been severely impacted.

74.    The retail industry has faced tough market conditions since the Great Recession. Consumer sentiment and disposable income levels dwindled during the recession, pushing consumers to cut back on all discretionary spending, including toy and hobby purchases. While consumer spending is up since the worst of the recession, foot traffic in retail stores such as the Debtors' has not recovered. As such, revenues from hobby and toy sales have continued to decline.

### 3.    The Debtors Attempt to Restructure Out of Court.

75.    In December 2016, with disappointing holiday sales and dwindling cash, the Debtors undertook a significant effort to complete an out-of-court restructuring of the business. Efforts were focused on the strategic positioning of the Companies as well as on daily costs of operations.

76.    In particular, management determined that shedding unprofitable Retail Store locations would be critical to the Companies' survival.  Based on an analysis of the Companies'

historical and 2016 revenues at each Retail Store, the Companies determined that eighteen (18)

of the then-forty (40) Retail Store locations were unprofitable and would need to be shut down as

part of any restructuring; with an additional three (3) stores that were marginally profitable and

trending down also slated for closing.

77.     Although the plan called for shutting down twenty-one stores, each with a

separate landlord, eighteen (18) of the twenty-one landlords were managed by three mall

developers:  Simon Property Group ("**Simon**"), General Growth Properties ("**GGP**"), and

Westfield, LLC ("**Westfield**").   The Companies determined that if they could reach a

composition agreement with these three parent companies, then the Debtors should be able to

execute "one off" agreements with the remaining landlords.  If, however, the composition effort

proved unsuccessful, the Companies were prepared to move forward expeditiously with a

bankruptcy filing.

78.     In quick succession, the  Companies took several steps to achieve the necessary

restructuring:

- The Companies prepared presentations for Simon, GGP, and Westfield, respectively.

- The Companies prepared emails and letters to the affected landlords notifying them of the Companies' precarious financial situation and requesting meetings with the landlords' representatives.

- The Companies engaged in discussions with AMPR, the Companies' then-subordinated lender, regarding the Companies' need to restructure and soliciting funding for early lease terminations.

- Beginning with January 2017 rent, the Companies would cease paying rent on the store locations subject to early termination.

- The Companies retained Adelman & Gettleman, Ltd. as insolvency counsel, and consulted counsel as the Companies were to embark on the proposed landlord negotiations.

79.     AMPR was willing to consider funding the early lease terminations, subject to the Companies reaching agreements in principle with the landlords.  However, before the Companies could send out their introductory letters to landlords, the Companies experienced a sudden halt in their access to cash that significantly jeopardized their restructuring plan and ultimately forced the Companies to focus instead on a bankruptcy sale and/or liquidation.

**4.  Siena Cuts Off the Companies' Access to Cash.**

80.     Exacerbating the Companies' financial straits entering 2017 was their inability to access the credit facility with Siena.  The proceeds of the Siena Loan had been repaid in full in accordance with the terms thereof, and the Companies were in a requisite 60-day "clean up" period under the loan, during which time they were unable to borrow against their accounts receivable and inventory.  This left the Companies with insufficient cash and no way to access financing through February 2017.  Consequently, on or about January 4, 2016, the Companies reached out to Siena about the possibility of AMPR buying out Siena's senior secured position, under the belief that the Companies' precarious financial condition coupled with the risk of a bankruptcy might offer Siena an incentive to sell its position and avoid finding itself mired in such a scenario.

81.     Much to the Companies' surprise and dismay, Siena reacted instead by finding the Companies in default of certain loan covenants.  In light of the alleged defaults, Siena initiated charges against the Debtors in excess of $280,000 and swept the Debtors' Collections Account of all cash receipts for the following week.

82.     The Companies suddenly found themselves without access to the cash they were relying on to fund near-term operations during the anticipated landlord negotiations.  Consequently, the Companies were forced to cease paying January rent on all Retail Store

locations rather than simply the unprofitable stores. While the Companies still hoped to achieve out-of-court settlements with landlords of the unprofitable Retail Stores, doing so would be exponentially more difficult given the inability to pay any of the Companies' landlords in the interim.

### 5.   The Companies Negotiate a "Soft Landing".

83.   On or about January 3, 2017, the Companies delivered their introductory letters to all landlords, with the hope that they could quickly reach a composition agreement with Simon, GGP and Westfield; secure one-off settlements with certain other landlords; obtain funding of the settlements from AMPR; and cure any defaults under the remaining leases.

84.   While the Companies began these efforts in earnest, they also realized the need to prepare for the potential of a bankruptcy filing. Despite scheduling calls with representatives of both GGP and Westfield on or about January 5, 2017, the Companies' financial condition continued to deteriorate – to the point what was once the Debtors' "fall back" scenarios was now the most likely outcome.

85.   The Debtors believed that a chapter 11 would maximize the value of their assets. The Debtors therefore began soliciting proposed lenders for debtor-in-possession financing. The Debtors' efforts to secure financing included inquiries to Bibby Financial Services; Gibraltar Business Capital; Encina Business Credit; PNC Financial; JPMorgan Chase; and BMO Harris Bank. Key steps included the preparation of a thirteen (13) week cash flow forecast; a delineation of the inventory and other assets available to secure the facility under the assumption that Amzak and AMPR would subordinate their liens; and a definition of the going-concern that was anticipated to emerge from chapter 11, including leases to be assumed.

86.     Despite intensive efforts by the Debtors, none of the financial institutions with whom the Debtors communicated submitted a financing proposal, let alone expressed a willingness to lend, to the Debtors absent an unconditional commitment from the Debtors' secured lenders to subordinate their respective liens and/or an additional infusion of subordinated debt below the DIP facility.   However, Amzak and AMPR were unwilling to consider subordinating their respective lien positions absent a term sheet from any proposed lender.  This dynamic created a catch-22 for the Debtors, one that stymied efforts to secure DIP financing from any new funding sources.

87.     With DIP financing from outside channels unavailable, the Debtors turned their attention to Amzak and AMPR, hoping to secure financing for what the Debtors viewed as a "soft landing" – chapter 11 – rather than the "hard landing" of a chapter 7.

88.     Discussions with Amzak and AMPR focused on the additional value available from an orderly liquidation process and going-concern sale in a chapter 11 as compared to the additional expenses likely in a chapter 11.

89.     Over the course of almost three weeks, the Debtors explained to Amzak and AMPR the merits of a chapter 11 in terms of maximizing the value of the Debtors' assets, be it on an orderly liquidation basis, going-concern basis, or some combination of the two.   The Debtors' management prepared a liquidation analysis which, in their estimation, would produce a higher recovery for creditors than would a "fire sale" under chapter 7.  Despite Amzak's and AMPR's initial preference for a chapter 7, ultimately the Debtors were able to negotiate with Amzak and AMPR sufficient DIP financing and use of Cash Collateral to effectuate what the Debtors describe herein as their blueprint in the Chapter 11 Cases.

**J.     The Filing of the Chapter 11 Cases**

90.     In light of the foregoing, the Companies desire to move expeditiously with an orderly liquidation of inventory at the Retail Stores while also exploring all avenues toward a sale of their remaining assets.  As to the former, the Companies intend to work closely with Gordon Brothers Retail Partners, LLC ("**Gordon Brothers**"), which has numerous years of experience operating retail liquidations.  As to the latter, the Companies intend to retain Hilco IP Services, LLC d/b/a Hilco Streambank, a seasoned investment banker in the retail industry with a particular expertise in marketing intellectual property in chapter 11.  Both phases of the Chapter 11 Cases are intended to maximize the recovery on the Companies' assets for the benefit of the estates and their creditors.

91.     Given the burn rate of the Companies' cash, the demands of the Retail Store landlords for return of the leased space, the limited use of Cash Collateral and DIP financing afforded by Amzak, and the decreasing value of the Companies' assets, the Companies hope to achieve an expeditious and cost-effective, two-step sale process: First, to begin immediate liquidation of inventory.[24]  Second, to undertake an efficient marketing and sale process for the Companies' Intellectual Property.

92.     In order to enable them to operate efficiently and to avoid the adverse effects that the Chapter 11 Cases might otherwise have on their business while they undertake the sales, the Companies have requested various types of relief in the First-Day Motions filed with this Court on the Petition Date.

## III.    <u>FIRST-DAY MOTIONS</u>

93.     A critical element in the Companies' attempt to maximize the benefit to their creditors is approval of each of the Companies' First-Day Motions submitted concurrently

---

[24] The Debtors intend to retain approximately $150,000 of inventory in conjunction with the potential sale of the Debtors' wholesale business.

herewith.  Based on my personal knowledge and the review discussed above, I believe that the relief sought by the Companies in the First-Day Motions is necessary to enable the bankruptcy estates to be administered effectively and to give the Companies their best chance to effect a sale process that will maximize the value of the estates for the benefit of all creditors.

94.     Failure to grant such relief would have a serious negative effect on the Companies' efforts to continue operating during the Chapter 11 Cases.  For example, the Companies must utilize Cash Collateral and DIP financing to effectuate an orderly liquidation of its inventory, as well as to sufficiently market their Intellectual Property.  The inability to access DIP financing and pay ordinary course business expenses will result in substantial and irreparable harm to the value of the Companies' assets and would otherwise not be in the best interests of these estates and their creditors.

95.     Factual information in support of the First-Day Motions is provided below and in the corresponding motions filed concurrently herewith.

## A.     Joint Administration of the Chapter 11 Cases

96.     The Debtors request entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Federal Rule of Bankruptcy Procedure 1015(b) (the "**Joint Administration Motion**").  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the case of Marbles Holdings, LLC and also request that an entry be made on the docket of each of the Chapter 11 Cases, other than Marbles Holdings, LLC, to reflect the joint administration of these cases.

97.     Given the integrated nature of the Debtors' operations, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in the Chapter 11 Cases will jointly affect Marbles Holdings, LLC and its affiliates that also

have filed chapter 11 cases. The entry of an order directing joint administration of the Chapter 11

Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the

U.S. Trustee and all parties in interest to monitor the Chapter 11 Cases with greater ease and

efficiency.

98.     I believe that the relief requested in the Joint Administration Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

the Debtors to continue to operate their business in chapter 11 without disruption.

**B.      Cash Collateral and DIP Financing**

99.     By their motion for authority to enter into postpetition secured financing and for

use of cash collateral  (the "**DIP Motion**"), the Debtors seek approval of, among other things: (a)

use of the Cash Collateral of Amzak and AMPR, the Debtors' prepetition secured lenders; and

(b) postpetition financing by Amzak (the "**DIP Facility**"), the Debtors' senior secured lender, as

set forth in that certain Senior Secured Super-Priority Debtor in Possession Credit Agreement

(the "**DIP Agreement**").  Under the DIP Agreement, the Debtors will have access to $900,000 in

the aggregate maximum principal amount of $800,000 (on an interim basis) and $900,000 (on a

final basis) and (b) the consensual use of Cash Collateral. The relief requested in the DIP Motion

is critical to ensuring the certainty that the Debtors will have sufficient liquidity throughout the

duration of these Chapter 11 Cases.

100.    Management of the Debtors reviewed and analyzed their anticipated cash needs

and prepared a 13-week projection (as updated from time to time in accordance with the terms of

the DIP Agreement, the "**Budget**") outlining the Debtors' postpetition cash needs in the initial 13

weeks of these Chapter 11 Cases. The Debtors believe that the Budget is an accurate reflection of

their funding requirements over the identified period, will allow them to meet their obligations –

including the administrative expenses of the Chapter 11 Cases – and is reasonable and appropriate under the circumstances.

101.    Based on this forecast, the Debtors determined that they would require access to both Cash Collateral and postpetition financing to provide sufficient liquidity to efficiently administer the Debtors' estates during these Chapter 11 Cases. Among other things, the Debtors need such liquidity to satisfy payroll, pay their taxes, and make other payments that are essential or appropriate for the efficient administration of the Debtors' estates. The Debtors' ability to continue making such payments during the Chapter 11 Cases is essential to the preservation of their assets during the pendency of these cases.

102.    The Debtors require interim approval of the DIP Facility. Debtors do not have sufficient cash flow to meeting their expenses during the Chapter 11 Cases.  Moreover, the Debtors' total cash balance is less than $125,000 (including cash on hand at each store) insufficient to satisfy any shortfall during the cases.

103.    Additionally, approval of the DIP Facility provides certainty concerning the Debtors' potential sale of their Intellectual Property. The backdrop of the DIP Facility provides comfort to all parties, including any potential bidders, that the Debtors will have sufficient liquidity to bridge from the Petition Date through the consummation of a sale. Thus, the Debtors believe that failure to obtain interim approval of the DIP Facility could hinder their ability to obtain the highest or otherwise best offer in an asset sale.

104.    Accordingly, without the immediate relief requested in the DIP Motion, I believe that the Debtors face a material risk of substantial, irreparable, and ongoing harm. Access to Cash Collateral and the DIP Facility will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates, and responsibly administer the Chapter 11 Cases.

1. **The Debtors Do Not Have Readily Available Sources of Alternative Financing.**

105.    The Debtors do not have alternative sources of financing readily available. All of the Debtors' assets are encumbered under the Siena Loan and the AMPR Loans, which, along with the Debtors' uncertain financial condition and overall weakness in the retail industry, restrict the availability of, and options for, postpetition financing.  AMPR also made it clear that it would not consent to "priming" DIP financing provided by a third party.  As a result, the Debtors do not believe third-party DIP financing would be reasonably obtainable.

106.    Nevertheless, as described above, the Debtors, solicited proposals for alternative DIP financing.  Management reached out to ten (10) potential sources of financing outside of AMPR to gauge their interest in providing such financing to the Debtors.  However, no party provided a proposal for independent postpetition financing due to the size of the facility; the uncertainty surrounding any sale of the Companies' assets; and the unwillingness of the Debtors' secured lenders to subordinate their debt. Accordingly, the Debtors were unable to develop an alternative source of financing with terms better than those of the DIP Facility, and for all of the foregoing reasons, I believe that the DIP Facility is reasonable, appropriate, and provides the best terms presently available to the Debtors.

2. **The Fee in Connection with the DIP Facility is Reasonable.**

107.    The Debtors have agreed, subject to Court approval, to pay a loan commitment fee of $50,000 to Amzak pursuant to the DIP Agreement. I believe that it is understood and agreed by all parties, including the Debtors, that this fee is an integral component of the overall terms of the DIP Facility, and was required by AMPR as consideration for the extension of the postpetition financing.

108.     For the foregoing reasons, I believe that the relief requested in the DIP Motion is in the Debtors' best interests and will enable the Debtors to preserve and maximize the value of their estates.

### C.     Cash Management

109.     The Debtors request the authority to: (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor-in-possession accounts, if needed; and (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession (the "**Cash Management Motion**").

110.     The Companies' cash management system is managed by responsible individuals under my direction.  Through utilization of the cash management system, the Companies are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the bank accounts required to effect collection, disbursement, and movement of cash.  I believe that the movement of funds through the Companies' cash management system as described herein and in the Cash Management Motion is accurate.

111.     As part of their cash management system, the Debtors have established a collections account ("**Collections Account**") and a disbursement account ("**Disbursement Account**") in the operation of their business (the "**Bank Accounts**")   The Bank Accounts are maintained at JPMorgan Chase Bank, N.A. (the "**Bank**").

112.    I believe that the Bank Accounts constitute an integral component of the Companies' operations, and that the Companies should seek a waiver of the U.S. Trustee's requirement that such accounts be closed and that new postpetition bank accounts be opened.  If enforced, I believe the requirement will cause unnecessary disruption to the Companies' ability to maximize the value of their estates.  If such relief is not granted, the Companies will suffer significant harm resulting from the termination of the present system and the inherent delay in establishing postpetition systems and procedures governing the use and application of Companies' funds.  In addition, because of the Companies' integrated financial structure, it would not be possible to establish a new system of accounts and a new cash management and disbursement system without substantial additional costs and expenses to the bankruptcy estates.

113.    To protect against inadvertent payment of prepetition claims, the Companies' personnel and the personnel at the Bank with whom the Companies customarily deal will be instructed how to distinguish readily between prepetition and postpetition obligations without closing existing accounts and opening new ones.  To ease the task of distinguishing between prepetition date and postpetition date checks, I believe that the Companies will be able to: (a) leave a "gap" in check numbers such that check numbers preceding the gap will be readily identifiable as prepetition checks and the check numbers following the gap will be readily identifiable as postpetition checks; or (b) otherwise utilize their existing software to implement a monitoring system which has the same effect.

114.    I believe that due to the nature and scope of Companies' business and the numerous vendors, customers and others with whom the Companies transact business, the Companies must also seek authority to continue their use of existing business forms, correspondence and checks without alteration or change.  Changing correspondence and business

forms would be unnecessary, would be burdensome to their estates, would result in undue expense and would be disruptive to the Companies' ongoing business operations.

115.    If the Companies are not permitted to continue to use their existing business forms, the resulting prejudice will include significant delay in the administration of their business operations and the imposition of an unnecessary cost to the estates to print new business forms.

116.    Similarly, the Companies must seek authority to continue to use their existing books and records to minimize expense to the estates.  I believe that opening new books and records would be burdensome to the estate and disruptive to the Companies' business operations. The Companies have fully functioning systems that thoroughly and accurately account for all cash and track the Companies' financial performance.  Changing the current system would be costly and would greatly increase the potential for error.

117.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to efficiently administer their estates in chapter 11 without disruption.

**D.      Prepetition Wages, Benefits and Insurance Coverage**

118.    The Debtors request authority to (a) pay prepetition wages, salaries, wage-related benefits, other compensation, and reimbursable employee expenses and (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto (the "**Wages/Benefits Motion**").

119.    I understand and believe that the description of the prepetition wage claims, benefits and related employee obligations discussed herein and further set forth in detail in the Wages/Benefits Motion is accurate.

120.    There exists a critical need for the Companies immediately to pay certain prepetition wage and benefit claims of each of the Companies' Employees, including outstanding wages and wage-related benefits, all related withholdings and taxes, accrued reimbursable business expenses and prepetition claims arising in connection with the Companies' employee health, disability, and life insurance (collectively, the "**Prepetition Employee Obligations**"). The satisfaction of these Prepetition Employee Obligations is critical to the Companies' ability to retain qualified employees to continue to operate their business for the benefit of the creditors and other interested parties in the Chapter 11 Cases.  As noted above, as of the Petition Date, the Companies collectively employ over 333 employees, 75 of whom are full-time.

121.    In total, as of the Petition Date, the Companies estimate that $33,691.03 in Prepetition Wage Claims are owed to the Employees, approximately $3,600 in employer and employee federal, state and local withholding and payroll-related taxes relating to prepetition periods, and approximately $8,000 in reimbursable business expenses incurred prepetition. These estimated amounts are included in anticipated disbursements allocated in the Budget, which is an exhibit to the DIP Financing Order.

122.    The Companies intend to maintain the health, dental, life, disability, and worker's compensation insurance coverage (collectively, the "**Employee Insurance Benefits**") for their Employees during the pendency of the Chapter 11 Cases.  The Companies believe that, as of the Petition Date, all premiums for Employee Insurance Benefits were fully paid, although there may be checks for such payment still in float, or wire transfers not yet fully processed.  In an abundance of caution, to the extent there are any claims relating to Employee Insurance Benefits which arose prior to the Petition Date and remain unpaid, the Companies are requesting authority to pay such claims, consistent with and in the ordinary course of their business.

123.   The Companies believe that the payment of the foregoing sums is critical to retaining their Employees in order to effectuate an orderly liquidation of the Debtors' inventory while the Debtors also pursue a sale of the Debtors' Intellectual Property in the Chapter 11 Cases.   No Employees shall be paid in excess of the $12,850 limits provided under sections 507(a)(4)-(5) of the Bankruptcy Code.

### E.   Prepetition Taxes

124.   The Debtors request authority, in their sole discretion, to remit and pay certain accrued and outstanding prepetition taxes, including sales, use, trust fund, and other similar taxes and related obligations in the estimated amount of $85,290 (the "**Taxes Motion**").

125.   In the ordinary course, the Debtors incur and/or collect certain Taxes and remit such Taxes to various governmental authorities. A large portion, if not all, of the Taxes, may constitute "trust fund" taxes, which are required to be collected from third parties and held in trust for payment to Taxing Authorities.

126.   The Debtors must continue to pay the Taxes, particularly those for which the Debtors' management could otherwise be held personally liable; failure to pay those Taxes could otherwise pose a costly distraction to management at a time when they must focus on the expeditious sale of the Debtors' assets.

127.   I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

### F.   Prepetition Gift Cards and Customer Programs

128.   The Debtors request entry an order authorizing, but not directing, them to honor certain customer-related policies, agreements, and offers, and corresponding payment obligations

arising both before and after the Petition Date, particularly their (a) gift card obligations, (b) customer programs as described in this Motion, and (c) credit card processing agreements, consistent with, and in, the ordinary course of their business (the "**Gift Cards/Customer Programs Motion**").

129.   Continuously from November 2011 through the present, the Debtors have issued gift cards to customers who prepay for credit which may later be redeemed for merchandise of equivalent price both on the Debtors' e-commerce website and at any Retail Store location. From time to time, the Debtors have also offered promotions allowing customers to purchase gift cards which, for a limited time, hold a value higher than the amount paid by the customer.

130.   Approximately 13,600 Conventional Gift Cards were outstanding as of the Petition Date, with an aggregate face value of approximately $375,000.   For accounting purposes, the Debtors treat gift cards older than two years old as having been abandoned; therefore, the figures contained in the Gift Cards/Customer Programs Motion reflect only gift cards less than two years old.   Based on past experience, the Debtors believe it is unlikely that a substantial number of gift cards over two years old will be redeemed after the Petition Date; it is nonetheless the Debtors' policy to honor such gift cards if and when they are presented.

131.   Approximately 6,500 Promotional Gift Cards were outstanding as of the Petition Date, with an aggregate face value of approximately $74,000.   Based on past experience, however, the Debtors estimate that only 50 to 75 percent of the outstanding Promotional Gift Cards will be redeemed before their promotional value expires.

132.   The Debtors also maintain a return policy that allows customers to return unopened merchandise within 90 days of purchase for a full refund or store credit (at the customer's option), minus the cost of return shipping, if any.   The Debtors seek to maintain their

current return program, irrespective of whether returned merchandise was purchased before or after the Petition Date.

133.    Since November 2010, the Debtors have operated a customer loyalty program designed to generate and sustain customer loyalty and goodwill.  Enrolled customers accrue one reward point for every dollar they spend either on the Debtors' website or in any retail store location.  The Debtors seek to continue to operate their rewards programs and to honor rewards vouchers, irrespective of whether they were earned or issued before or after the Petition Date, and including (to the extent feasible) any liquidation sale(s) that may be authorized by the Court.

134.    In the months leading up to the holiday season, the Debtors operate a program whereby certain enthusiastic customers, known as brand ambassadors, are recruited to showcase the Debtors' products to their friends and communities.  The Debtors estimate that such obligations will total approximately $4,000.  Failing to pay these obligations will result in a disproportionate harm to the Debtors' business, due to the brand ambassadors' (who are chosen, in large part, based on their social media presence) unique ability to influence consumer sentiment.

135.    Finally, the Debtors are parties to certain agreements with credit card companies and processors which enable the Debtors to accept credit card and debit card payments, subject to certain adjustments, returns, promotional fees, and refunds.  The Debtors have an agreement with Chase Paymentech, an affiliate of JPMorgan Chase, which facilitates the acceptance and processing of Visa, MasterCard, and Discover card payments.  The Debtors have a separate agreement with American Express, which facilitates the acceptance and processing of American Express card payments.

136.    As of the Petition date, the Debtors estimate that approximately $20,000 was owed to credit card companies and processors, substantially all of which is believed to have arisen from credit card transactions occurring in January 2017.  If the Debtors failed to pay these fees timely, it is likely that credit card companies or processors would suspend or terminate the Debtors' ability to accept some or all credit cards postpetition.

137.    The success of the Debtors' proposed sale of the Intellectual Property related to the Debtors' e-commerce and wholesale business is largely contingent upon the Debtors' ability to retain their current customers and maintain their goodwill in the marketplace.  Paying the Customer Obligations keeps the Debtors in business during their sales efforts, maximizing the value of their assets and, in turn, maximizing the potential recovery of all creditors.

### G.    Store Closing Sales

138.    The Debtors request the entry of an order that, among other things, authorizes the Debtors to conduct closing sales at their Retail Stores and to assume a consulting agreement with a nationally-recognized liquidating consultant to assist with the process (the "**Sale Motion**"). Recognizing that that time is of the essence, the Debtors prepared budgets and forecasts for an expedited but orderly inventory liquidation (the "**Sale**").  Management of the Debtors decided that the Debtors require the benefits and protections of the Bankruptcy Code during the Sale in order to maximize the value of the Debtors' store merchandise.

139.    Realizing that the Debtors did not possess the requisite skill and knowledge to conduct expedited orderly closings of the Retail Stores, the Debtors interviewed several industry-leading and nationally known store closing / liquidation consultants. The Debtors entered into non-disclosure agreements with three of these consultants and provided each of them proprietary information about the Debtors' operations, margins, distribution channels, inventory, and all

related information necessary for the consultants to make proposals to the Debtors regarding cost and methodology of an orderly inventory sales.

140.    The Debtors considered both "agency" style and "true-consultant" style engagements to conduct the orderly inventory sales. The Debtors believe the consultant-style agreement with Gordon Brothers Retail Partners, LLC ("**Gordon Brothers**") is in the best interest of the Debtors and their creditors. In reaching this determination, the Debtors considered all relevant factors, including the Debtors' cash flows; the relatively short duration of the inventory sale (less than 60 days) vis-à-vis when the Debtors would receive a guaranteed minimum payment under an agency-style agreement; the control over expenses; the expected outcome of the store closing sales; the elimination of having to grant priming liens; and the consent of the Debtors' secured lenders.

141.    If the Debtors are not permitted to assume the conduct the orderly inventory sales with the assistance of Gordon Brothers, the Debtors believe it will undermine their entire objective of selling inventory in an orderly, but not "fire-sale," fashion. The Debtors need the accelerated sales and increased cash flow generated by a comprehensive store closing outside of a chapter 7, a Uniform Commercial Code sale, or some other form of immediate asset disposition. Likewise, the Debtors will not be able to sustain operations if they are required to operate in a manner which is more akin to ordinary course than an orderly store closing sales.

142.    Without the ability to conduct the store closing sales pursuant to an agreement with Gordon Brothers, the Debtors will be unable to sustain their operations. With unsustainable operations and the inability to achieve an orderly wind-down as contemplated with the store closing sales, the Debtors would likely be required to "fire-sale" their inventory in bulk, thereby depressing its value.

143.    The Debtors believe that the store closing sales are an essential and critical component of the Debtors' ability to maximize value and minimize expenses. Any restrictions in their leases or applicable non-bankruptcy law that would prohibit, restrict, or otherwise interfere with the store closing sales would substantially impede the Debtors' ability to have orderly and efficient store closing sales.

144.    In connection with the store closing sales, the Debtors believe that a severance payment to store managers will benefit the Debtors and their creditors. The Debtors believe that the severance payments will motivate the store managers and facilitate the store closing sales, thereby increasing the Debtors' prospects for maximizing sale proceeds and minimizing disruption.  On the other hand, if a store manager were to quit, such a vacancy would likely need to be filled by more expensive personnel. Such attrition at this difficult time will cause delays and frustrate the goals of the store closing sales because the Debtors will need to seek additional employees to manage the stores, and such new employees will likely be less familiar with the Store Assets.  Ultimately, such delays will reduce the overall success and profitability of the store closing sales

145.    The Debtors will make every reasonable effort to sell all merchandise, furniture, fixtures, and equipment at the stores as quickly and efficiently as possible for the purpose of monetizing such assets and vacating the Stores as soon as possible. The Debtors may, however, determine that the costs associated with the continued storage and sale efforts respecting certain Store Assets at any given Retail Store could exceed the projected proceeds which could be realized from the Sale thereof, or that remaining Stores Assets may have low prospects for resale. In such event, any remaining Store Assets would likely impose a financial burden on the

estates, in the form of storage and removal costs, but are unlikely to provide much, if any, value in return to the estates.

146.    I believe that the relief requested in the Sale Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, in that it will enable the Debtors to maximize the value realized from a sale of the Debtors' inventory.

### H.    Noticing Agent

147.    The Debtors request entry of an order pursuant to 28 U.S.C. § 156(c) and Local Bankruptcy Rule 1007-2, authorizing the employment and retention of Garden City Group, LLC (the "**GCG**") as noticing, claims, and/or administrative agent, as the case may be, in connection with the Chapter 11 Cases, in accordance with the terms and conditions set forth in GCG's Retention Agreement.

148.    Retention of a noticing agent is required not only by Local Rule given that the Debtors collectively have, and Holdings alone has, over 500 creditors; it will also save the Debtors, their counsel and/or the court clerk's office, as the case may be, significant time and expense required to, among other things: (a) send out notices to numerous creditors in the Chapter 11 Cases; (b) provide creditors and other parties-in-interest with a repository for information concerning the Chapter 11 Cases; (c) manage the processing of claims and maintenance of a register therefor; and/or (d) otherwise provide logistical support as needed in the Chapter 11 Cases.  I believe that the relief requested in the retention motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable management of the Debtors to dedicate their time and effort to expeditiously administering and disposing of the assets of the Debtors without disruption.

IV.    **MOTIONS TO BE FILED ON OR SHORTLY AFTER PETITION DATE**[25]

149.    In addition to the First-Day Motions, the Companies will be requesting other relief shortly following the Petition Date.  Among other things, the Companies will seek to retain Hilco IP Services, LLC d/b/a Hilco Streambank ("**Hilco Streambank**") as their investment banker and Adelman & Gettleman, Ltd. as general bankruptcy counsel in the Chapter 11 Cases. I believe the retention of Hilco Streambank and Adelman & Gettleman, as well as other relief sought below, is essential to the success of the Chapter 11 Cases and to the Companies' ability to maximize the value of their estates for the benefit of creditors.

A.    **Investment Banker**

150.    The Companies have selected Hilco Streambank to serve as their investment banker in the Chapter 11 Cases, for the purposes of marketing and selling (to the extent of the Companies' rights and interests in such property, if any) their trademarks, patents, copyrights, domain names, customer lists and data, and proprietary content including game designs, packaging, logos, and the like (the "**Intellectual Property**").

151.    Hilco Streambank has extensive experience in, and an excellent reputation for, providing high quality intellectual property disposition services in bankruptcy proceedings and other distressed situations.  Hilco Streambank and its principals have managed the intellectual property sales for RadioShack, Borders Group, Dots, Mervyn's, Heilig Meyers, KB Toys, Goody's Family Clothing, Circuit City, Ritz Camera, Movie Gallery/Hollywood Video, and numerous other companies.  In these cases, Hilco Streambank's services have included the identification of assets available for sale, the identification of potential buyers, developing and executing marketing programs for the assets, and negotiating the terms of any sales.

---

[25] The motions described herein are not intended as an exhaustive list of motions to be filed following the Petition Date.

152.    I believe that Hilco Streambank is well qualified to serve as investment banker to the Debtors.  Its extensive experience and resources will enable the Companies to secure the highest and best sale price for the Intellectual Property, which will ultimately benefit the Companies' estates and their creditors.

**B.**    **Chapter 11 Counsel**

153.    The Companies have selected the law firm of Adelman & Gettleman, Ltd. as their insolvency and restructuring counsel in the Chapter 11 Cases.  Prior to the Chapter 11 Cases, the Companies retained Adelman & Gettleman to assist the Companies in analyzing their alternatives and effectuating a course of action to address the Companies' financial difficulties.  I believe the continued representation of the Companies by Adelman & Gettleman is critical to the success of the Chapter 11 Cases because, among other things, the firm is familiar with the Companies' business and legal affairs leading into the Chapter 11 Cases.

154.    The Companies selected Adelman & Gettleman as their attorneys because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, and now-comprehensive experience with and knowledge of the Companies and their business and the goals in the Chapter 11 Cases.  Accordingly, I believe the Companies should seek to retain Adelman & Gettleman under a general retainer for their professional counseling and legal services in connection with the Chapter 11 Cases.

**C.**    **Utilities**

155.    The Debtors will request the entry an order authorizing payment of deposits as adequate assurance of payments for utility services, and prohibiting the utility companies from altering, refusing to provide, or discontinuing the utility services, or discriminating against the

Debtors solely on the basis of the commencement of the Chapter 11 Cases or on account of any unpaid invoice for services provided prior to the Petition Date (the "**Utilities Motion**"). During the time it takes the Debtors to wind down remaining operations and sell the assets of their business, it is important that utilities services continue uninterrupted. I believe that the Debtors' proposed procedures governing the utility companies' requests for adequate assurance are appropriate in the Chapter 11 Cases. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to efficiently administer the Chapter 11 Cases without disruption.

## V.    CONCLUSION

156.    In order to minimize any loss to the value of the Companies' assets and to maximize the benefit to the Companies' creditors and estates, the Companies' immediate objective is to immediately undertake the liquidation of inventory at all of its Retail Stores and the marketing and sale of the Companies' Intellectual Property, which the Companies believe have meaningful value. I believe that if the Court grants the relief requested in each of the First-Day Motions and other motions to follow, the prospect of achieving such objectives, and thus maximizing the recovery for the Debtors' estates and creditors, will be significantly enhanced.

Dated: 2/3/17

GIRISHA CHANDRARAJ