## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MARBLES HOLDINGS, LLC, et al.,[1] | ) | Case No. 17-3309 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Timothy A. Barnes |
| | ) | |
| | ) | **Hearing Date:  October 24, 2017** |
| | ) | **Hearing Time: 11:00 a.m.** |

### NOTICE OF MOTION

PLEASE TAKE NOTICE that on **October 24, 2017 at 11:00 a.m.**, we shall appear before the Honorable Timothy A. Barnes of the United States Bankruptcy Court for the Northern District of Illinois, or any other judge sitting in his place and stead, at Courtroom 744 in the Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois, and then and there present the **APPLICATION OF ADELMAN & GETTLEMAN, LTD. FOR ALLOWANCE OF FINAL COMPENSATION AND PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTORS AND FOR LIMITED NOTICE**, a copy of which is attached hereto and hereby served upon you.

ADAM P. SILVERMAN, ESQ. (ARDC #6256676)
ERICH S. BUCK, ESQ. (ARDC #627635)
ALEXANDER F. BROUGHAM, ESQ. (ARDC #6301515)
ADELMAN & GETTLEMAN, LTD.
53 W. Jackson Blvd., Suite 1050
Chicago, Illinois 60604
Tel. (312) 435-1050
Fax (312) 435-1059
**Counsel for Marbles Holdings, LLC, Marbles LLC, and Marbles Brain Workshop, LLC**

---

[1]  The debtors in these Chapter 11 cases, along with the last four digits of each debtor's federal taxpayer identification number, are (i) Marbles Holdings, LLC (9547); (ii) Marbles LLC (3081); and (iii) Marbles Brain Workshop, LLC (0303).

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true copy of the foregoing Notice of Motion and the document referred to therein were served upon the persons listed on the below Service List via CM/ECF, or U.S. First Class Mail, as indicated, this 29th day of September, 2017.

By: /s/ Erich S. Buck
Erich S. Buck, Esq.

## SERVICE LIST

### VIA CM/ECF

- Howard L. Adelman     hla@ag-ltd.com, dbaird@ag-ltd.com
- Richard A Bixter     richard.bixter@hklaw.com
- Dustin P Branch     branchd@ballardspahr.com, carolod@ballardspahr.com
- Michael A Brandess     mbrandess@sfgh.com, bkdocket@sfgh.com
- Alexander F Brougham     abrougham@ag-ltd.com, dbaird@ag-ltd.com
- Erich S Buck     ebuck@ag-ltd.com, agroboski@ag-ltd.com
- Shelly A. DeRousse     sderousse@freeborn.com, bkdocketing@freeborn.com;jhazdra@ecf.inforuptcy.com
- David R Doyle     ddoyle@shawfishman.com, kjanecki@shawfishman.com
- Devon J Eggert     deggert@freeborn.com, bkdocketing@freeborn.com
- Elise S Frejka     efrejka@frejka.com
- Jeffrey L. Gansberg     jgansberg@muchshelist.com, nsulak@muchshelist.com
- Chad H. Gettleman     cgettleman@ag-ltd.com, ts@ag-ltd.com
- Emily S. Gottlieb     emily_gottlieb@gardencitygroup.com, paul.kinealy@gardencitygroup.com;PACERTeam@gardencitygroup.com
- Allen J Guon     aguon@shawfishman.com, cowens@shawfishman.com
- Timothy M Howe     tim@chicagolaw.biz
- Elizabeth L Janczak     ejanczak@freeborn.com, bkdocketing@freeborn.com
- Robert J. Labate     robert.labate@hklaw.com
- Patrick S Layng     USTPRegion11.ES.ECF@usdoj.gov
- Matthew Luzadder     mluzadder@kelleydrye.com, KDWBankruptcyDepartment@KelleyDrye.com;kkleist@kelleydrye.com;mvicinanza@ecf.inforuptcy.com
- Daniel J McGuire     dmcguire@winston.com, ECF_BANK@winston.com
- Henry B. Merens     hbm@ag-ltd.com, ts@ag-ltd.com
- David Nold     nuddin@noldmuchlaw.com, mfolsom@noldmuchlaw.com
- Kristen N Pate     ggpbk@ggp.com
- M. Gretchen Silver     ustpregion11.es.ecf@usdoj.gov, gretchen.silver@usdoj.gov;denise.delaurent@usdoj.gov;maria.e.yapan@usdoj.gov
- Adam P. Silverman     asilverman@ag-ltd.com, tslack@ag-ltd.com
- Jerry L Switzer     jswitzer@polsinelli.com, chicagodocketing@polsinelli.com
- David P. Vallas     DVallas@polsinelli.com

<u>VIA U.S. FIRST CLASS MAIL</u>

Marbles Holdings, LLC
Marbles LLC
Marbles Brain Workshop, LLC
Attn: Michael Smith, CEO/CFO
3100 Dundee Road, Suite 111
Northbrook, IL 60062

Amanda Demby
Province, Inc.
17000 Ventura Blvd., Suite 300
Encino, CA 91316

Niclas A. Ferland, Esq.
Ilan Markus, Esq.
LeClairRyan
545 Long Warf Drive, 9th floor
New Haven, CT 06511

Graham S. Mitchell, Esq.
Nelson Mullins Riley & Scarborough L.L.P.
1320 Main Street, 17th floor
Post Office Box 11070 (29211)
Columbia, SC 29201

Robert L. LeHane, Esq.
Gilbert R. Saydah Jr., Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178

Ronald M. Tucker, Esq.
225 West Washington Street
Indianapolis, IN 46204

Ernie Zachary Park, Esq.
Bewley, Lassleben & Miller, LLP
13215 E. Penn Street, suite 510
Whittier, CA 90602-1797

M. Evan Meyers, Esq.
Meyers, Rodbell & Rosenbaum, P.A.
6801 Kenilworth Avenue, suite 400
Riverdale, Maryland 20737-1385

Julie H. Rome-Banks
Binder & Malter LLP
2775 Park Avenue
Santa Clara, CA 95050

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In Re  MARBLES HOLDINGS, LLC, et al., )
)
) Bankruptcy No. _____17-3309_____
)
Debtor. ) Chapter _____11_____

## COVER SHEET FOR APPLICATION FOR PROFESSIONAL COMPENSATION
## (IN CASES UNDER CHAPTERS 7, 11 AND 12)

Name of Applicant: _____ Adelman & Gettleman, Ltd. _____

Authorized to Provide Professional Services to: Marbles Holdings, LLC, Marbles LLC, and Marbles Brain Workshop, LLC

Date of Order Authorizing Employment: _____ March 1, 2017, effective retroactively to February 3, 2017 ___

Period for Which Compensation is Sought:

From _____ February 4 _____, _2017_  through _____ September 22 _____, _2017_

Amount of Fees Sought: $ 694,800.00 (movant only seeks payment of $110,392.48, including both fees and expenses)

Amount of Expense Reimbursement Sought: $ 7,428.36 (movant only seeks payment of $110,392.48, including both fees and expenses)

This is an: Interim Application _____ Final Application ✔___

If this is *not* the first application filed herein by this professional, disclose as to all prior fee applications:

| Date Filed | Period Covered | Total Requested (Fees & Expenses) | Total Allowed (Fees & Expenses) | Fees & Expenses Previously Paid |
|---|---|---|---|---|
| | | | | |

Dated: _____ September 29, 2017 _____       _____ /s/ Erich S. Buck _____
                                                          (Counsel)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MARBLES HOLDINGS, LLC, et al.,[1] | ) | Case No. 17-3309 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Honorable Timothy A. Barnes |
| | ) | |
| | ) | **Hearing Date:  October 24, 2017** |
| | ) | **Hearing Time: 11:00 a.m.** |

## APPLICATION OF ADELMAN & GETTLEMAN, LTD. FOR
## ALLOWANCE OF FINAL COMPENSATION AND PAYMENT OF
## FEES AND REIMBURSEMENT OF EXPENSES AS COUNSEL
## <u>TO THE DEBTORS AND FOR LIMITED NOTICE</u>

NOW COME Howard L. Adelman, Esq., Henry B. Merens, Esq., Brad A. Berish, Esq.,

Adam P. Silverman, Esq., Erich S. Buck, Esq., Alexander F. Brougham, Esq., Nicholas R.

Dwayne, Esq., and the law firm of Adelman & Gettleman, Ltd. (collectively, "**Movant**"),

counsel to Marbles Holdings, LLC ("**Holdings**"), Marbles LLC ("**Marbles**"), and Marbles Brain

Workshop, LLC ("**Workshop**"), debtors and debtors in possession (collectively, the "**Debtors**"),

and hereby submit the following application (the "**Application**") requesting the allowance and

payment of final compensation and reimbursement of ordinary and necessary expenses incurred

in connection therewith as counsel to the Debtors in the above-captioned jointly administered

cases (the "**Chapter 11 Cases**"), pursuant to section 330 of the United States Bankruptcy Code

(the "**Code**"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy

Rules**"), and Rule 5082-1 of the Local Rules of the United States Bankruptcy Court for the

---

[1]  The debtors in these Chapter 11 cases, along with the last four digits of each debtor's federal taxpayer
identification number, are (i) Marbles Holdings, LLC (9547), (ii) Marbles LLC (3081); and (iii) Marbles
Brain Workshop, LLC (0303).

Northern District of Illinois (the "**Local Rules**"), and for limited notice thereof under Bankruptcy

Rule 2002.  In support of the Application, Movant respectfully states as follows:

## I.       INTRODUCTION

This Application seeks allowance of fees and expenses with respect to the approximately

eight-month period from February 4, 2017[2], the day after the Petition Date (as hereinafter

defined), through and including September 22, 2017 (the "**Application Period**")[3].  The

employment of Movant was authorized by an order of the Court entered on March 1, 2017,

effective retroactively to the Petition Date.  [*See* ECF No. 156].

During the Application Period, Movant incurred not less than $694,800.00 in fees and

$7,428.36 in expenses, all of which resulted in a commensurate benefit to the Debtors' estates.

Movant seeks final allowance of its fees and expenses in this amount.  Prior to the Petition Date,

however, Movant agreed to a cap of $400,000 on the fees and expenses it would be paid from the

Debtors' postpetition debtor-in-possession ("**DIP**") financing over the course of the Chapter 11

Cases, reflected in the Debtors' final DIP financing order and budget.  The Debtors' DIP lender

later agreed to an additional $75,000 in funding for the preparation of a Chapter 11 plan and

disclosure statement, which the Debtors and the official committee of unsecured creditors (the

"**Committee**") agreed would go to Movant in consideration for its preparation of initial drafts of

those documents.  Finally, just prior to the effective date of the Chapter 11 plan, the DIP lender

agreed to provide Movant an additional $10,000 from the lender's share of its cash collateral, in

recognition of Movant's significant unpaid efforts in the Chapter 11 Cases.  All told, Movant's

---

[2] In light of the filing of the Chapter 11 Cases the night of February 3, 2017, and the application of a prepayment for fees and expenses of Movant incurred up to the time of filing, the post-filing period for which Movant requires allowance and payment of fees and expenses begins on February 4, 2017.

[3] Due to the September 29, 2017 deadline to file professional fee applications in the Chapter 11 Cases, Movant's billing statements for the month of September only cover fees and expenses incurred through September 22, 2017.

fees and expenses incurred in the Chapter 11 Cases were subject to a designated cap of $485,000 (the "**Compensation Cap**").[4]

While Movant seeks <u>allowance</u> of $702,228.36 in fees and expenses incurred during the Application Period, in light of the Compensation Cap, Movant has voluntarily reduced its actual <u>compensation</u> for such fees and expenses by over $183,000. Movant has already received $374,607.52 of the $485,000 available under the Compensation Cap as a result of its monthly fee requests in the Chapter 11 Cases, subject to Court approval. Consequently, Movant only seeks payment of the $110,392.48 remaining within its Compensation Cap.

## II.    BACKGROUND OF THE DEBTORS AND THE CHAPTER 11 CASES

### A.    Prepetition Period

1.    The Debtors were a developer, wholesaler, and specialty retailer of games, puzzles, books and software designed to strengthen and stimulate the brain. Doing business under the name "Marbles: The Brain Store," the Debtors' business comprised the following primary segments: (1) retail stores; (2) e-commerce; and (3) wholesale. As of the commencement of the Chapter 11 Cases, the Debtors operated thirty-seven (37) retail stores in thirteen (13) states (the "**Retail Stores**" or "**Retail Business**"). In addition to the sale of merchandise through their Retail Stores, the Debtors also sold merchandise (x) directly to consumers through the www.marblesthebrainstore.com e-commerce platform (the "**E-Commerce Platform**"); and (y) to retailers and wholesale distributors located in North America, Europe and Australia (the "**Wholesale Platform**").

2.    With a significant portfolio of proprietary game and toy content available in their stores and online, the Debtors generated a combined $28 million in revenue in 2016 through their

---

[4] In addition to the amount budgeted or otherwise made available by the DIP lender, Movant applied a credit of $33,939.25 to its first monthly fee request in the Chapter 11 Cases, representing the remaining balance of a prepayment Movant received from the Debtors prior to the filing of the Chapter 11 Cases.

multi-channel distribution platform.  The Debtors employed a total of approximately 1,032

employees in 2016, including seasonal employees.

3.       Unfortunately, despite substantial investment from two private equity firms in

November 2014 and February 2016, the Debtors began to face significant operational challenges

typical of the retail industry as a whole, including declining mall traffic, decreased sales,

expensive leases, and an increased consumer emphasis on internet-based retail.  The Debtors

eventually concluded that their ongoing operations were unsustainable.

4.       The Debtors determined that the best way to maximize value for the benefit of all

creditors was (a) the prompt and orderly wind-down of the Retail Business through the

implementation of closing sales at the Retail Stores (collectively, the "**Retail Store Closing**

**Sales**") coupled with (b) the marketing and sale of the Debtors' intellectual property and other

assets related to the Retail Stores, as well as their E-Commerce Platform and Wholesale

Platform, in each case through the benefits and protections afforded debtors under the Code.

**B.**      **Bankruptcy Petition and Initial Administrative and Procedural Steps**

5.       On February 3, 2017 (the "**Petition Date**"), each of the Debtors filed a voluntary

bankruptcy petition under Chapter 11 of the Code.  At the outset of these filings, the Debtors

obtained authority from the Court to have their Chapter 11 Cases jointly administered, with the

case of Holdings serving as the "lead case" for filing purposes.

6.       On February 13, 2017, the Committee was appointed in the Chapter 11 Cases.

7.       Early in the Chapter 11 Cases, the Debtors and certain other parties in interest

filed motions seeking various forms of relief, including but not limited to:

- Jointly administering the Chapter 11 Cases;

- Continuing use of  the Debtors' existing cash management system and books and
  records;

876716v6                                                                                    4

- Paying certain prepetition employee wage and benefit claims;

- Paying prepetition sales, use, and trust fund taxes;

- Honoring of existing gift cards and customer programs;

- Providing adequate assurance of payment to utilities; and

- Retaining various professionals in the Chapter 11 Cases, including (a) the Debtors' bankruptcy counsel and investment bankers, and (b) the Committee's primary and local bankruptcy counsel and financial advisors.

8.      The foregoing list is only a representative sample of the numerous administrative matters for which the Debtors and other parties in interest requested and obtained the Court's authority over the course of the Chapter 11 Cases.

## C.      DIP Financing Order

9.      As of the Petition Date, the Debtors were parties to secured financing agreements with Amzak Capital Management, LLC ("**Amzak**") and AMPR Marbles Investors, LLC ("**AMPR**").  The Debtors' prepetition indebtedness was secured by valid security interests in substantially all of the Debtors' assets.  On or about March 3, 2017, the respective debts and security interests held by Amzak and AMPR were acquired by Spin Master, Ltd. ("**Spin Master**").

10.      On April 4, 2017, the Court entered its *Final Order (I) Authorizing the Debtors to Obtain Secured Postpetition Financing on a Super-Priority and Priming Lien Basis, (II) Authorizing the Debtors to Use Cash Collateral of Existing Prepetition Secured Lenders and Granting Adequate Protection* [ECF No. 210] (the "**DIP Financing Order**").  The DIP Financing Order authorized the Debtors to access a DIP facility of up to $1.7 provided by Spin Master.

11.     The DIP Financing Order was the product of intensive and protracted negotiations between the Debtors, the Committee and Spin Master.  Spin Master asserted a blanket lien on substantially all of the Debtors' assets, securing debt in excess of $15 million.  The Committee had initially disputed the validity and extent of Spin Master's claims and the liens securing such claims.  The dispute also called into question the right of Spin Master, as a secured creditor, to "credit bid" for the purchase of the Debtors' IP Assets (as defined hereinafter) pursuant to section 363(k) of the Code, assets which Spin Master claimed as its collateral.

12.     At the conclusion of negotiations between the Debtors, the Committee, and Spin Master, however, the parties ultimately agreed on a framework, embodied in the DIP Financing Order, that would affirm the validity of Spin Master's security interests in the Debtors' assets and its right to credit bid for such assets, while also assuring the availability of funds for distribution to the Debtors' unsecured creditors.

**D.     Retail Store Closing Sales**

13.     As noted above, the overall strategy of the Debtors in the Chapter 11 Cases was to execute a two-prong sale process. In order to achieve the first prong of the Debtors' sale efforts – the liquidation of Retail Store inventory – the Debtors filed their *Motion for Interim and Final Orders (A) Authorizing the Debtors to Assume Store Closing Agreement; (B)  Authorizing the Debtors to Conduct Retail Store Closing Sales and Sell Inventory Free and Clear of All Liens, Claims, Encumbrances, and Interests; (C) Approving the Sale Guidelines and Waiving or Invalidating Contractual Restrictions and Liquidation Laws Precluding Certain Types of Sales; (D) Authorizing the Implementation of an Employee Bonus Consisting of Severance Payments to Certain Non-Insiders; and (E) Granting Such Other and Further  Relief as is Warranted* [Docket No. 9] (the "**Retail Store Closing Motion**"), which was approved on a final basis on March 1,

2017 [Docket No. 157] (the "**Retail Store Closing Order**").  The Retail Store Closing Order

authorized the Debtors to conduct the Retail Store Closing Sales.

14.     Pursuant to the Retail Store Closing Order, the Debtors, with the assistance of

their Court-appointed liquidation consultant, Gordon Brothers Retail Partners, LLC ("**Gordon**

**Brothers**"), undertook an intensive sale process in which all or substantially all inventory

associated with the Retail Business was liquidated.  The Retail Store Closing Sales concluded on

or before March 31, 2017.  In connection with the Retail Store Closing Sales, the Court further

entered orders (the "**Lease Rejection Orders**") authorizing the Debtors to reject all of the

unexpired leases of non-residential real property relating to the Retail Stores.  In accordance with

the Retail Store Closing Order and the Lease Rejection Orders, the Debtors liquidated

substantially all of their Retail Store inventory, vacated and surrendered the Retail Stores to the

landlords, and abandoned any remaining personal property located in the Retail Stores following

lease rejection which the Debtors deemed burdensome or of minimal value to their estates.

**E.      Sale of Substantially All IP Assets to and Transition Services for Spin Master**

15.     With respect to the second prong of the Debtors' sale efforts, prior to the Petition

Date the Debtors engaged Hilco IP Services, LLC d/b/a Hilco Streambank ("**Hilco**

**Streambank**"), an expert in the marketing and sale of intellectual property, to represent the

Debtors in the sale of their intellectual intangible property and such other assets that were central

to the Debtors' business, including trademarks, domain names, proprietary toys and games, and

customer data; certain inventory; certain fixed assets in the Debtors' headquarters and leased

warehouse; certain books and records; rights in executory contracts and unexpired leases; and

other assets pertaining to the Debtors' retail, e-commerce and wholesale businesses (collectively,

the "**IP Assets**").  The marketing efforts undertaken by Hilco Streambank since the outset of the

Chapter 11 Cases included: (a) identifying and preserving the IP Assets; (b) developing

marketing materials and other information describing the IP Assets, the history and their use and

availability for sale; (c) creating a virtual data room containing information concerning the IP

Assets; (d) ascertaining and contacting potential strategic and financial buyers for the IP Assets;

(e) exchanging emails and participating in meetings by phone and in person with potential

buyers; and (f) negotiating with potential buyers of agreements to acquire the IP Assets.

16.     As a consequence of the foregoing efforts, Hilco Streambank was able to generate

bids from four (4) parties expressing interest in making an offer for the IP Assets that could be

used as a stalking-horse bid, subject to higher and better offers.  Based on their discussions with

these parties, and extensive negotiations between two of them, the Debtors ultimately selected

the stalking-horse bid in the form of a credit bid from Spin Master in the amount of $2.5 million

for the sale of substantially all of the IP Assets (the "**Stalking-Horse Bid**").

17.     The IP Assets included the Debtors' customer data, certain of which constituted

"personally identifiable information" under section 101(41A) of the Code ("**PII**"). As a result, on

or about April 7, 2017, the Office of the United States Trustee (the "**UST**") appointed a

consumer privacy ombudsman (the "**CPO**") pursuant to order of the Court.  As required under

section 332 of the Code, the CPO was tasked with evaluating the Debtors' applicable privacy

policies governing the customer data and filing a report with the Court (the "**CPO Report**")

recommending any restrictions that should be imposed on the transfer of such data as part of a

proposed sale of the IP Assets.

18.     On April 7, 2017, the Court entered the *Order: (A) Approving the Sale Process

and Bidding Procedures with Respect to Sale of E-Commerce and Wholesale Business Assets

and Certain Other Assets of the Estates; (B) Approving Form of and Authorizing the Debtors to*

*Enter Into Stalking Horse Purchase Agreement; (C) Approving Bid Protection; (D) Scheduling a Public Auction and Subsequent Sale Hearing; (E) Authorizing the Sale of the Assets of the Debtors Free and Clear of Liens, Claims, Encumbrances and Interests; (F) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (G) Approving the Form of Notice and Manner of Notice of Sale Hearing and Proposed Assumption and Assignment* [ECF No. 217] (the "**Bidding Procedures Order**"), approving the Debtors' proposed sale process and bidding procedures for the IP Assets.

19.     Hilco Streambank notified potential buyers that any offers to acquire all or substantially all of the IP Assets were required to be submitted in writing on or before a specified bid deadline and of the auction to consider additional bids for the assets. Ultimately, the Debtors did not receive any additional bids to compete with the Stalking-Horse Bid.  Accordingly, pursuant to the Bidding Procedures Order, the auction was canceled, and the Stalking-Horse Bid of $2.5 million from Spin Master was determined by the Debtors to be the highest and best offer received.

20.     On April 26, 2017, the Court entered that certain *Order Authorizing Sale of E-Commerce and Wholesale Business Assets and Certain Other Assets of the Estates of the Debtors Free and Clear of Liens, Claims, Encumbrances, and Interests, Assumption and Assignment of Executory Contracts and Unexpired Leases and Related Relief* [ECF No. 260] (the "**Sale Order**"), authorizing the sale to Spin Master of most, but not all, of the IP Assets ( the "**Acquired Assets**") pursuant to an asset purchase agreement dated as of April 7, 2017 (the "**IP Sale**").  The Sale Order also approved a transition services agreement between the Debtors and Spin Master (the "**TSA**"), pursuant to which designated employees of the Debtors were to provide certain services to Spin Master related to the transitioning of the Acquired Assets.  The

closing of the IP Sale occurred on April 28, 2017, with the parties executing the TSA effective as of April 29, 2017.

21.     By notice filed on May 17, 2017, Spin Master also confirmed its purchase of certain of the Debtors' customer data (including PII), which, pursuant to the CPO Report, required that Spin Master succeed to the Debtors' privacy policies governing the customer data. Also pursuant to the CPO Report, the Debtors caused to be destroyed the remaining customer data that the CPO had deemed non-transferable as part of the IP Sale.

## F.    **Aptos Data Breach**

22.     Aptos, Inc. ("**Aptos**") is the e-commerce platform provider that hosted the software and systems to support online transactions for the Debtors' website, www.marblesthebrainstore.com, prior to and during the Chapter 11 Cases.  Prior to the Petition Date, in December 2016, Aptos identified an intrusion to a portion of its systems that holds the payment card data and certain other customer information of Aptos' various clients, including the Debtors' customer payment card data and information (the "**Aptos Data Breach**").  Between February 2016 and December 2016, the attackers gained access to customer information, including payment card numbers, as customers made transactions on the Aptos-hosted platform; additionally, the attackers had access to historical payment card data.  In cooperation with various law enforcement officials, Aptos deferred any notification of the Aptos Data Breach to February 7, 2017 (after the Petition Date).

23.     Since learning of the Aptos Data Breach in February 2017, the Debtors worked with Aptos and its counsel on notices to the offices of state attorneys general or the like in twenty-three (23) states, commonwealths, and provinces where Aptos has informed the Debtors that notices are required under applicable state law.  With respect to the Debtors' affected

customers, the Debtors prepared consumer notification letters, which were sent by email to those states permitting email notification to consumers and by mail to those states that do not permit email notification.

24.     The Debtors are the insured party under a cyber-liability policy with Hiscox Inc. ("**Hiscox**") which has covered certain expenses associated with the Aptos Data Breach.  Among other things, the Debtors have since retained special privacy and data security counsel, Baker & Hostetler LLP ("**B&H**").  In consultation with Hiscox and B&H, the Debtors established a plan of response to the Aptos Data Breach that included notification of any appropriate government authorities where not already done by Aptos; notification of credit card processors where not already done by the Debtors or Aptos; and notification of affected consumers where not already done by the Debtors.  To date, all such parties have been notified and the Debtors have responded to all additional inquiries from consumers and government authorities, although the possibility of further questions or inquiries remains.

**G.     Wind-Down Efforts**

25.     After completing their "dual track" sale process of the Retail Store Closing Sales and the IP Sale, the Debtors wound down their remaining affairs and provided transition services to Spin Master.  The transition services terminated on or about June 23, 2017.  As for other wind-down efforts, the Debtors, among other things, obtained Court authority for the following:

- Terminating and winding up the Debtors' 401(k) plan;

- Retaining a 401(k) plan auditor;

- Rejecting numerous unexpired leases of real and personal property and executory contracts (other than the leases for the Retail Stores);

- Destroying certain boxes of the Debtors' records no longer needed by the estates and storing certain boxes and electronic records for a period of seven (7) years; and

- Retaining RSM US LLP ("**RSM**") as the Debtors' accountants to prepare 2016 and 2017 tax returns.

**H.**     **Disclosure Statement and Plan**

26.     On July 27, 2017, the Debtors and the Committee filed their *Joint Liquidating Plan* [ECF No. 361] (the "**Plan**"), accompanied by a corresponding *Disclosure Statement for Joint Plan of Liquidation Proposed by Debtors and the Official Committee of Unsecured Creditor Pursuant to Chapter 11 of the United States Bankruptcy Code* [ECF No. 360] (the "**Disclosure Statement**").

27.     The Plan is a plan of liquidation and provides for the distribution of the proceeds from the liquidation of the Debtors' assets by (a) transferring certain of the Debtors' cash and other assets to Spin Master; and (b) transferring certain of the Debtors' cash and other assets, as carved out by Spin Master, to a creditor trust (the "**Creditor Trust**") for distribution by a creditor trustee (the "**Creditor Trustee**") to holders of administrative expense, priority and general unsecured claims pursuant to the terms of a creditor trust agreement (the "**Creditor Trust Agreement**").

28.     Under the Plan, and as of its effective date of September 29, 2017 (the "**Effective Date**"), the Creditor Trustee is tasked with the enforcement and prosecution of claims and litigation, reconciliation and resolution of claims against the Debtors' estates, the filing of any reports and payment of any fees required under 28 U.S.C. § 1930, and such other administration of the Plan to the extent not within the express purview of the Debtors.  After the Effective Date, and after administration of the Creditor Trust by the Creditor Trustee, all assets held in the Creditor Trust will be distributed in accordance with the terms of the Plan and the Creditor Trust Agreement.

29.     The Disclosure Statement summarized the classification and treatment of claims

and equity interests under the Plan as follows:

| Class | Description | Entitled to Vote | Estimated Claims[5] | Approx. Estimated Recovery | Treatment |
|---|---|---|---|---|---|
| Unclassified | Administrative Expense Claims | N/A | $424,452[6] | 100% | Full satisfaction in cash or cash equivalent paid on the later of (a) the Effective Date, or (b) allowance by the Court. |
| Unclassified | Priority Tax Claims | N/A | $45,895.82 | 100% | Full satisfaction in cash or cash equivalent paid on the later of (a) the Effective Date, or (b) allowance by the Court. |
| Class 1(a)-(c) | Priority Non-Tax Claims | No | (a): $305.70; (b) $253.99; (c): $0.00[7] | 100% | Full satisfaction in cash or cash equivalent paid on the later of (a) the Effective Date, or (b) allowance by the Court. |
| Class 2(a)-(c) | Secured Claims | No | (a): $15,518,651.80; (b): $15,518,651.80; (c): $368,932.46[8] | 100% | On or as soon as practicable following the later of the Effective Date or allowance by the Court: (a) |

[5] Unless otherwise indicated, estimates based on filed claims, or where no claim was filed, claims scheduled as liquidated, non-contingent and undisputed. Estimates assume (a) reclassification of claims filed against the wrong Debtor; (b) classification of claims against an unidentified Debtor; and (c) elimination of duplicative claims.

[6] Estimate based on all unpaid administrative expenses as of July 24, 2017, except for the administrative expenses of Committee members and professionals.

[7] Excludes employee claims arising under section 507(a)(4)-(5) of the Code, which, pursuant to prior order of the Court, were paid in full during the Chapter 11 Cases.

[8] Excludes claims of NOW and RIM (as defined hereinafter), which, pursuant to the prior order of the Court, received payments in full satisfaction of their alleged claims.

| Class | Description | Entitled to Vote | Estimated Claims[5] | Approx. Estimated Recovery | Treatment |
|---|---|---|---|---|---|
| | | | | | cash or cash equivalent in amount equal to the proceeds of collateral securing such claim(s), or (b) transfer of the collateral securing such claim(s). |
| Class 3(a)-(c) | General Unsecured Claims | Yes | (a): $5,844,841; (b): $5,478,694; (c): $0.00 | Unknown | *Pro rata* distribution(s) of the Creditor Trust funds, subject to payment of any allowed unbudgeted expense claims, 503(b)(9) claims and priority claims in full and net of reasonable fees and expenses incurred by the Creditor Trust, in cash or cash equivalent paid on the later of (a) the Effective Date, (b) allowance by the Court, or (c) the date on which the Creditor Trustee makes distributions under the Plan on account of such Class 3 general unsecured claims. |
| Class 4(a)-(c) | Equity Interests | No | Unknown | 0% | Cancellation, with no cash or cash equivalent available for distribution. |

30.     The Debtors sought and obtained an order which, among other things, approved solicitation procedures for seeking confirmation of the Plan.  [*See* ECF No. 363].  Impaired creditors were required to file their ballots with respect to the Plan on or before August 21, 2017.

31.     On August 30, 2017, after an overwhelming majority of creditors voted in favor of confirmation of the Plan, the Court entered an order approving the Disclosure Statement and confirming the Plan [ECF No. 390].

### III.     MONTHLY PAYMENT REQUESTS

32.     During the Application Period, Movant periodically sought and received compensation and reimbursement of expenses on an interim basis pursuant to that certain *Order Establishing Procedures for the Payment of Interim Compensation and Reimbursement of Expenses of Professionals and Members of the Official Committee of Unsecured Creditors*, entered on March 6, 2017 [ECF No. 164] (the "**Payment Procedures Order**").  The Payment Procedures Order permitted professionals retained in the Chapter 11 Cases to present a monthly statement of services rendered and expenses incurred to counsel for a group of key parties in interest in the Chapter 11 Cases (the Debtors, the UST, the Committee, and the Debtors' secured lender).  Absent a timely objection, the Debtors were authorized to pay eighty percent (80%) of the fees incurred by a professional for the stated period, with a twenty percent (20%) holdback, and one hundred percent (100%) of expense disbursements.  Such payments remained subject to final approval by the Court.

33.     Movant made four (4) separate payment requests pursuant to the Payment Procedures Order (the "**Payment Requests**").  Each Payment Request consisted of a detailed statement of services rendered by category and costs incurred during the applicable period of time.  No party objected to any of Movant's Payment Requests.  The fees and expenses covered

by, and the holdback amounts retained under, each Payment Request may be summarized as

follows:

| Payment Request | Period Covered | Total Fees Accrued | Total Fees Paid | Total Expenses Paid | Holdback Amount |
|---|---|---|---|---|---|
| First | 2/4/17 – 2/28/17 | $170,904.00 | $102,783.95[9] | $5,226.25 | $34,180.80 |
| Second | 3/1/17 – 3/31/17 | $199,316.00 | $159,452.80 | $633.59 | $39,863.20 |
| Third | 4/1/17 – 4/30/17 | $100,148.00 | $80,118.40 | $777.65 | $20,029.60 |
| Fourth | 5/1/17 – 5/31/17 | $50,326.37 | $25,275.51[10] | $339.37 | $6,318.88 |

34.    As a result of its Payment Requests, Movant has thus far been paid a total of

$367,630.66 in fees and $6,976.86 in expenses during the Chapter 11 Cases, all subject to final

approval by the Court.  An additional $110,392.48 in fees and expenses remains available to

Movant within the Compensation Cap, and is held back pending an order on this Application.

**IV.    LEGAL SERVICES RENDERED**

35.    For ease of reference, Movant has identified and set forth eight (8) categories of

legal services rendered during the Application Period: (a) General Matters; (b) Retail Store

Matters; (c) DIP Financing; (d) IP Sale; (e) Fee Petition; (f) Claims; (g) Plan/Disclosure

Statement; and (h) Unsecured Creditors' Committee.  Each category contains a narrative of the

matters involved; a general description of the tasks performed; detailed time records in

chronological order, with each attorney's time described therein, and the nature and purpose of

such entries; and the result achieved or benefit to the estates, as required in this jurisdiction.  *See*

---

[9]  Movant applied a credit of $33,939.25 to the first Payment Request, representing the remaining balance of a prepayment Movant received from the Debtors prior to the Petition Date.

[10]  At the time of the Debtors' fourth Payment Request, due to the Compensation Cap (which was then $475,000) and the fees and expenses thus far paid to, or held back from, Movant, a balance of $31,933.76 remained available for compensation and reimbursement of the Debtors' fees and expenses in the Chapter 11 Cases.  Consequently, the Debtors' fourth Payment Request sought an interim compensation and reimbursement payment of only $25,275.51 (80% of $31,594.39) in fees and $339.37 in expenses.

Fed. R. Bankr. P. 2016; Bankr. N.D. Ill. R. 5082-1; *In re Wildman*, 72 B.R. 700, 707-08 (Bankr.

N.D. Ill. 1987); *In re Pettibone Corp.*, 74 B.R. 293, 301 (Bankr. N.D. Ill. 1987).

36.     The total of all services rendered during the Application Period, in each of the

aforementioned categories, may be summarized as follows:

| Category | Total Hours | Value |
|---|---|---|
| General Matters | 456.4 | $171,598.00 |
| Retail Store Matters | 129.9 | $51,090.50 |
| DIP Financing | 280.9 | $121,675.50 |
| IP Sale | 375.7 | $163,370.50 |
| Fee Petition | 77 | $27,191.00 |
| Claims | 48.8 | $18,156.00 |
| Plan/Disclosure Statement | 326.7 | $133,778.50 |
| Unsecured Creditors' Committee | 19.2 | $7,940.00 |
| **TOTAL** | **1,714.6** | **$694,800.00** |

37.     While Movant seeks allowance of all fees and expenses incurred during the

Application Period, it bears repeating that in light of the Compensation Cap, Movant has

voluntarily reduced its total fees and expenses during the Application Period by over $183,000.

**A.     General Matters**

**Services Rendered During the Application Period**

| Attorney | Hours | Rate | Value |
|---|---|---|---|
| HLA | 13.9 | $525.00 | $7,297.50 |
| CHG | 1.2 | $525.00 | $630.00 |
| APS | 19.1 | $435.00 | $8,308.50 |
| ESB | 272.4 | $395.00 | $107,598.00 |
| AFB | 117.5 | $325.00 | $38,187.50 |
| NRD[11] | 2.4 | $315.00 | $756.00 |
| NRD | 29.9 | $295.00 | $8,820.50 |
| **TOTAL** | **456.4** | | **$171,598.00** |

---

[11] Over the course of the Application Period, 2.4 hours of time spent by associate Nicholas R. Dwayne was billed at $315.00 per hour, rather than his customary rate of $295.00 per hour.  Nonetheless, Mr. Dwayne's hourly rate was, at all times, consistent with Movant's typical range for associates, less than the hourly rate for associates quoted in the Debtors' engagement letter, and was indeed less than that of any other member of Movant.  In this table, the hours billed at each respective hourly rate are set forth separately.

38.    As set forth in <u>Exhibit A</u> hereto, Movant expended 456.4 hours during the Application Period in this category in connection with the performance of the Debtors' duties under section 1107 of the Code and the numerous administrative and related matters arising in the Chapter 11 Cases.  These matters included the many miscellaneous services that are usually required to be furnished on behalf of debtors-in-possession in Chapter 11 cases, as well as the many other matters that arose due to the complexity of the Debtors' affairs.

39.    The many efforts rendered by Movant in this category include:

A.    <u>First-Day Motions</u>.  In the earliest days of the Chapter 11 Cases, Movant presented motions for numerous forms of relief to allow the Debtors to function effectively and efficiently as debtors in possession, including motions to (i) jointly administer the Chapter 11 Cases; (ii) maintain the Debtors' existing cash-management system; (iii) pay certain prepetition employee wages, benefits, and related obligations; (iv) pay prepetition sales, use, trust fund, and other taxes and related obligations; (v) honor outstanding gift cards and customer programs; and (vi) provide adequate assurance of utility payments.  Although the preparation and filing of these motions was performed on or prior to the Petition Date, significant work remained to be done during the Application Period, including presenting the motions, negotiating their scope and effect with interested parties including the Committee and the UST, and advising the Debtors on their implementation of the resulting orders.

B.    <u>Retention of Professionals and Other Service Providers</u>.  Movant successfully sought the retention of itself as counsel to the Debtors, as well as the retention of many other firms and individuals to serve as professionals and other service providers to the Debtors: Gabriel Fried, David Peress, and Hilco Streambank, as investment banker; Garden City Group, LLC ("**GCG**"), as noticing, claims, and solicitation agent; Gordon Brothers, as consultant; RSM, as accountants; B&H, as special privacy and data security counsel; and John Mastrangeli and Philip+Rae & Associates, CPAs, as benefit plan auditor.

C.    <u>Employment-Related Noticing</u>.  Movant advised the Debtors on their noticing responsibilities under the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. §§ 2101-2109, and drafted several different versions of such notices, each directed to a different category of affected employees or governmental entities, as required by the statute.

D. <u>Preparation of Original and Amended Schedules</u>.  In addition to its many other responsibilities early in the Chapter 11 Cases, Movant worked closely with the Debtors' management to prepare and file the Debtors' extensive bankruptcy schedules and statement of financial affairs only twenty-one (21) days after the Petition Date.  Later, as more information became available, and in an effort to comply fully with their debtor-in-possession responsibilities, the Debtors filed amended versions of their schedules and statements of financial affairs.  In preparing each schedule and statement of financial affairs, Movant undertook a painstaking review of a multitude of financial records and drafts prepared by the Debtors' management, and participated in numerous conferences with the Debtors' employees.  Movant also prepared detailed summaries of the Debtors' various amendments which were then provided for notice purposes to the affected creditors and other interested parties.

E. <u>Key Employee Retention</u>.  Faced with the prospect of critical employees leaving the Debtors' employ at the worst possible time, Movant worked with the Debtors' management to devise a plan to pay retention bonuses to four (4) key non-insider employees which satisfied section 363(b) of the Code, and successfully moved for Court approval of this plan.

F. <u>Rejection of Executory Contracts and Non-Retail Store Leases</u>.  As the Debtors concluded their business operations, it became necessary to reject certain executory contracts and unexpired leases (particularly leases of personal property) to avoid imposing undue administrative burdens on their estates.  Separate and apart from the Debtors' first and second omnibus rejection motions,[12] the Debtors filed four (4) other motions to reject various contracts and leases, including but not limited to a credit-card processing agreement and leases covering a warehouse and the Debtors' corporate headquarters, respectively. The Debtors also had to seek, and obtained, a Court-approved extension of the deadline by which they were obligated to assume or reject leases of the Debtors' headquarters and distribution warehouse.

G. <u>401(k) Plan Termination</u>.  As an essential part of the Debtors' wind-down process, Movant successfully moved for authority to terminate a 401(k) plan covering a small number of the Debtors' employees, saving monthly management fees and allowing these employees to roll over or otherwise obtain distributions from the plan.

H. <u>Operating Reports and Quarterly Fee Statements</u>.  Movant worked to ensure the timely filing and dissemination of debtor-in-possession operating reports and other financial requirements.  Movant also discussed the calculation of the UST's quarterly fees with the Debtors' management, followed up with the

---

[12]   Work on the Debtors' first and second omnibus rejection motions is included in the Retail Store Matters category.

Debtors' management to ensure the prompt payment thereof, and facilitated the preparation and filing of quarterly fee statements.

I.   Meetings and Coordination of Efforts with UST.  Movant prepared the Debtors for and attended various critical meeting through the Chapter 11 Cases, including: (i) a meeting with the UST's office to review various "first day" motions prior to hearing on the same; (ii) the Committee formation meeting; (iii) the initial debtor-in-possession interview with the UST's office; and (iv) the meeting of creditors under section 341 of the Code.  Movant has routinely stayed in contact with representatives of the UST's office, providing periodic updates and seeking input on various matters arising in the Chapter 11 Cases.

J.   Miscellaneous.  Bankruptcy is unfamiliar territory for any business, and particularly in the case of a business of the Debtors' size and complexity, orchestrating an orderly wind-down can be an extraordinary challenge. Movant was in contact with the Debtors' management virtually every working day of the Chapter 11 Cases, providing solutions to help the Debtors fulfill the responsibilities of a debtor in possession while simultaneously maximizing the value of the Debtors' estates for the benefit of creditors.

**B.   Retail Store Matters**

### Services Rendered During the Application Period

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| HLA | 3.4 | $525.00 | $1,785.00 |
| APS | 57.3 | $435.00 | $24,925.50 |
| ESB | 27 | $395.00 | $10,665.00 |
| AFB | 42.2 | $325.00 | $13,715.00 |
| TOTAL | 129.9 | | $51,090.50 |

40.   As set forth in Exhibit B hereto, Movant expended 129.9 hours during the Application Period in this category, in connection with the Retail Store Closing Motion, the Retail Store Closing Sales, the rejection of the Debtors' retail store leases, and related matters.

41.   On the Petition Date, the Debtors filed their Retail Store Closing Motion, in an effort to swiftly implement the first prong of the Debtors' liquidation strategy: the closing of the Debtors' Retail Stores and liquidation of inventory in connection therewith.  The Retail Store Closing Motion sought extensive relief, including: (a) authorizing the Debtors to assume a retail

store closing agreement with Gordon Brothers; (b) authorizing the Debtors to conduct the Retail

Store Closing Sales; (c) approving certain proposed sale guidelines to govern the Retail Store

Closing Sales; and (d) authorizing the Debtors to implement and honor a severance payment for

certain non-insider personnel with responsibilities related to the Retail Store Closing Sales.  In

addition, Movant recognized that retail store closings are not as common in this jurisdiction as in

other jurisdictions. Accordingly, instead of simply stating that store closing procedures have

been widely adopted in recent retail bankruptcies, Movant provided a thorough and

comprehensive legal analysis and basis in support of the relief sought by way of the Retail Store

Closing Motion.

42.     Shortly after the Retail Store Closing Motion was filed, three parties—two

landlords and the Committee—filed objections.  After presenting the motion and receiving

feedback from the Court, the UST, the Committee, other objecting parties, and many additional

interested parties, Movant re-worked the proposed interim order.  Among other modifications,

Movant removed the assumption of Gordon Brothers' contract from the relief it granted, opting

instead to seek Gordon Brothers' employment by separate motion.  With these revisions in place,

the Court granted the motion on an interim, and then a final, basis.

43.     With the Retail Store Closing Order in place, Movant worked closely with

Gordon Brothers to ensure that the Retail Store Closing Sales achieved the highest possible

return for the Debtors' estates.  In so doing, Movant:

- Conferred with Retail Store landlords, many of whom resisted the
  implementation of the Retail Store Closing Order and attempted to use it as an
  opportunity to extract various concessions from the Debtors;

- Negotiated the terms of Gordon Brothers' retention with the Committee and Gordon Brothers to reflect evolving expectations of the Retail Store Closing Sales;

- Negotiated with numerous potential and actual purchasers of store inventory;

- Dealt with various government authorities taking action in derogation of the relief provided pursuant to the Retail Store Closing Order; and

- Reconciled, monitored, and disclosed the fees and commissions earned by, and paid to, Gordon Brothers, pursuant to applicable Court orders.

44.     Additionally, Movant prepared and prosecuted two omnibus motions to reject leases of Retail Store locations after they stopped operating.  As of the Petition Date, the Debtors were subject to thirty-eight (38) unexpired leases covering retail stores.  Each of these leases had to be rejected as quickly as possible once its corresponding retail store stopped operating, to avoid burdening the Debtors' estates with unnecessary claims for postpetition rent.  Both omnibus rejection motions also sought abandonment of estate property deemed by the Debtors to be burdensome or of inconsequential value or benefit to their estates.  In the process of seeking such relief, Movant communicated directly with counsel for many individual landlords to verify that their clients had adequate notice of the motions and to work out any potential objections in advance.  As a consequence of these communications, Movant ensured that rejection and abandonment in connection with the Retail Store Closing Sales were binding on all affected parties, and averted time-consuming litigation.

**C.     DIP Financing**

**Services Rendered During the Application Period**

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| HLA | 18.5 | $525.00 | $9,712.50 |

| | | | |
|---|---|---|---|
| HBM | 86.2 | $525.00 | $45,255.00 |
| BAB | 3.4 | $465.00 | $1,581.00 |
| APS | 0.7 | $435.00 | $304.50 |
| ESB | 127 | $395.00 | $50,165.00 |
| AFB | 45.1 | $325.00 | $14,657.50 |
| **TOTAL** | 280.9 | | $121,675.50 |

45.     As set forth in Exhibit C hereto, Movant expended 280.9 hours during the

Application Period in this category, which contains the Debtors' work in connection with the

Debtors' debtor-in-possession financing and related matters.  The DIP Financing Order was one

of the most hotly negotiated and time-consuming issues of the Chapter 11 Cases, but ultimately

resulted in a framework that enabled the Debtors to achieve a successful outcome – both with

respect to debtor-in-possession financing and plan confirmation.

46.     Much of Movant's work in this category was spent negotiating and drafting

successive versions of the DIP Financing Order and its predecessor, the interim debtor-in-

possession financing order [ECF No. 59, the "**Interim DIP Financing Order**"), and various

ancillary documents.  With several interested parties advancing ever-changing, and often

conflicting, positions with respect to the terms of postpetition secured financing, Movant was

perpetually in the process of discussing and modifying these documents.  The purchase of

Amzak and AMPR's secured debt by Spin Master created even more work for Movant, as it

introduced an entirely new set of interests and expectations on the part of the Debtors'

postpetition lender.

47.     Early in the case, while Movant was already immersed in negotiating and drafting

the DIP Financing Order, a new challenge emerged that threatened the delicately balanced

arrangements between the Debtors and their secured lenders.  As of the Petition Date, inventory

of the Debtors collectively valued at approximately $1.2 million was held in a warehouse in

Roselle, Illinois, owned by Now Express, Inc. ("**NOW**").  RIM Logistics, Ltd. ("**RIM**"), an

affiliate of NOW, acted as the Debtors' broker or agent to clear inventory through United States customs prior to and during the Chapter 11 Cases.  In February 2017, NOW and RIM asserted that they held possessory liens on the Debtors' inventory to secure unpaid fees for prepetition warehousing, transportation costs, and customs-clearing services.  NOW and RIM contended that their possessory liens were superior to Amzak and AMPR's security interests, and refused to release the Debtors' inventory from their warehouse (an act that would leave their claims unsecured) unless the Debtors paid off their debt, which totaled approximately $150,000.

48.     The Debtors were stuck in a difficult position: they needed inventory to continue their business operations, but were unable (in light of both their financial condition and also the terms of the Interim DIP Financing Order) to make such a large cash payment to satisfy RIM's and NOW's claims.  After intensive negotiations, however, the Debtors' secured lender agreed to modify the Interim DIP Financing Order to enable the Debtors to pay down their debt to RIM and NOW over time via adequate protection payments.  The Court approved the amended Interim DIP Financing Order on February 15, 2017.  Later, Movant successfully negotiated and moved for several other modifications to the Interim DIP Financing Order to further provide for the Debtors' funding needs.

49.     As the universe of claims and the likely future of the Chapter 11 Cases took shape, the DIP Financing Order gained significance.  If the Debtors, Spin Master, the Committee, and other interested parties were unable to reach a consensus on the Debtors' budgeted expenses and other provisions of the DIP Financing Order, the Chapter 11 Cases—and with them, the most efficient and fair means of realizing value for the Debtors' assets and distributing it to creditors—would have been unsustainable.  At this critical juncture, Movant

worked tirelessly to ensure that the Debtors were sufficiently funded to see them through to the conclusion of the Chapter 11 Cases.

50.     As noted above, *see supra* section II.C, resolution of the DIP Financing Order also effectively paved the way for an amicable and cost-effective conclusion of the Chapter 11 Cases.  Not only did the Debtors, the Committee, and Spin Master agree on the terms of the Debtors' funding during the Chapter 11 Cases; but further, the parties agreed on a framework for what would eventually become the Plan: In exchange for limited releases and the uncontested right to credit bid for the Debtors' assets, Spin Master agreed to make available funds for distribution to the Debtors' unsecured creditors.

51.     On April 4, 2017, the Court entered the DIP Financing Order.  At this stage, Movant's work in the DIP Financing category was nearly complete, aside from a limited amount of work required to twice amend the debtor-in-possession budget to account for, among other things, remediation of the Aptos Data Breach and a change in the Debtors' management, respectively.

**D.     IP Sale**

**Services Rendered During the Application Period**

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| HLA | 19.4 | $525.00 | $10,185.00 |
| CHG | 106.2 | $525.00 | $55,755.00 |
| APS | 30.6 | $435.00 | $13,311.00 |
| ESB | 182.9 | $395.00 | $72,245.50 |
| AFB | 35.9 | $325.00 | $11,667.50 |
| NRD | .7 | $295.00 | $206.50 |
| **TOTAL** | 375.7 | | $163,370.50 |

52.     As set forth in Exhibit D hereto, Movant expended 375.7 hours during the Application Period in this category, which concerned the sale of the IP Assets.

53.     Early in the Chapter 11 Cases, Movant's work in this category was concerned primarily with ensuring the IP Assets would be sold in a manner that was both cost-effective and agreeable to other parties in interest, such as the Committee and the UST.  Movant solicited and implemented feedback from these and other interested parties to craft the terms of Hilco Streambank's employment as investment banker for the IP Assets.

54.     Movant soon became involved in facilitating Hilco Streambank's marketing process.  Movant negotiated and drafted non-disclosure agreements with numerous prospective buyers, then conferred with their attorneys and other representatives to provide any information they needed.

55.     Meanwhile, Movant drafted the complex documents needed to effectuate the sale of the IP Assets, including an extensive asset purchase agreement and bidding procedures.  As the contemplated terms of the IP Sale evolved and became more complex, so did the drafts of these documents.

56.     Movant was faced with an unusual challenge when two different parties—Spin Master and another company—began aggressively pursuing the role of stalking-horse bidder for the IP Assets.  Both parties made attractive, yet very different, cases for being chosen to serve in this role.  After extensive negotiations with the two prospective stalking-horse bidders, Movant encouraged them to submit competing bids.  This "mini-auction" resulted in both parties improving their offers.  When the other party decided to walk away at the last possible opportunity, Spin Master remained, with a very favorable bid of $2.5 million for the Acquired Assets.

57.     Once Spin Master emerged as the stalking-horse bidder, extensive further negotiations and corresponding revisions to the asset purchase agreement and other

documentation were needed to achieve a mutually agreeable sale process.  During this time,

Movant also prepared several different forms of notices to ensure that all creditors and

executory-contract counterparties received notice in conformity with applicable provisions of the

Code.  Additionally, Movant prepared a motion to approve the Stalking-Horse Bid and the

extensive procedures applicable to the forthcoming auction[13] and sale.

58.     As the sale documentation, notices, and motion were being finalized, Movant was

simultaneously preparing for the likely need to appoint a CPO in connection with the IP Sale.

Collectively, sections 332(a) and 363(b)(a) of the Code require a CPO to be appointed in

connection with any sale of PII.  Movant worked closely with the UST to move for the

appointment of a CPO in conformity with this requirement.

59.     On April 7, 2017, after a hearing, the Court entered the Bidding Procedures

Order.  Thereafter, Movant worked diligently to implement its provisions.  Movant also

communicated regularly with (a) the CPO, to provide information needed to compile the CPO

Report; (b) GCG, to ensure that the sale and the potential assumption and assignment of leases

and contracts in connection therewith were properly noticed; and (c) potential bidders and their

counsel, to foster the development of competing bids.

60.     At roughly this time, Movant was informed that certain PII included in the IP

Assets may have been compromised in the Aptos Data Breach.  Movant responded proactively,

working with the Debtors' management, the CPO, Aptos, the Committee, Spin Master, and other

parties to determine both the nature of the breach and the resulting steps needed to be taken in

connection with the IP Sale.

61.     Ultimately, on April 26, 2017, the Court entered the Sale Order, authorizing the

sale of the Acquired Assets to Spin Master.  The Sale Order also approved the TSA, which

---

[13] The auction was ultimately canceled due to the lack of competing qualified bids for the IP Assets.

Movant had negotiated with Spin Master, under which designated employees of the Debtors
were to provide services to Spin Master related to the transitioning of the Acquired Assets.

62.     Both before and after the Sale Order was entered Movant negotiated the corporate

and transactional documentation and other deliverables needed to for the closing of the IP Sale.

And after these documents were executed and the Sale Order was entered, Movant assisted the

Debtors in complying with their responsibilities thereunder, facilitating the formal transfer of

assets such as customer data and trademarks.  Movant later coordinated with the Debtors

regarding the destruction of non-transferable customer data in accordance with the CPO's

recommendations and prepared and filed the requisite documentation confirming same.

**E.     Fee Petition**

**Services Rendered During the Application Period**

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| APS | 1.3 | $435.00 | $565.50 |
| ESB | 28.9 | $395.00 | $11,415.50 |
| AFB | 46.8 | $325.00 | $15,210.00 |
| **TOTAL** | 77 | | $27,191.00 |

63.     As set forth in Exhibit E hereto, Movant expended 77 hours during the

Application Period in this category.  The vast majority of  this time was spent preparing,

reviewing, and circulating Movant's four Payment Requests, which involved reconciling the

time entries of eight (8) different attorneys, eliminating any time believed to be duplicative or

otherwise unnecessary, and ensuring that the Payment Requests complied with the Court's

Payment Procedures Order.

64.     Also included in this category is preparation of this Application.  Movant

carefully reviewed its time entries throughout the Application Period and summarized both the

events of the Chapter 11 Cases and its contributions thereto, as required by section 330 of the

Code, Bankruptcy Rule 2014, Local Rule 5082-1, and applicable caselaw such as *Pettibone* and *Wildman*.[14]

65.    As the Supreme Court recently reaffirmed, a professional retained under section 327(a) of the Code may be compensated for time "reasonably required to prepare [its fee] application." 11 U.S.C. § 330(a)(6); *see also Baker Botts L.L.P. v. ASARCO LLC*, __ U.S. __, 135 S. Ct. 2158, 2167 (2015) (likening this service to "a car mechanic's preparation of an itemized bill," which benefits a customer by allowing the customer "to understand—and, if necessary, dispute—his expenses").

66.    The fees incurred by Movant in the Fee Petition category total $27,191, which represents approximately 3.9 percent of the $694,800 incurred by Movant in the Chapter 11 Cases, well within the three-to-five-percent proportionality guideline adopted by some courts in this jurisdiction. *See, e.g., In re Stainless Sales Corp.*, No. 17 B 3148, 2017 WL 2829675, at *1 (Bankr. N.D. Ill. June 27, 2017) (collecting cases).

## F.    Claims

### Services Rendered During the Application Period

| Attorney | Hours | Rate | Value |
|---|---|---|---|
| ESB | 32.8 | $395.00 | $12,956.00 |
| AFB | 16 | $325.00 | $5,200.00 |
| **TOTAL** | 48.8 | | $18,156.00 |

67.    As set forth in Exhibit F hereto, Movant expended 48.8 hours during the Application Period in this category, pertaining to Movant's management of the claims-submission process and the reconciliation of filed claims in the Chapter 11 Cases.

---

[14] A limited amount of time was also spent on this Application between September 23 – 29, 2017, but fees and expenses in incurred for this period of time are not included as part of this Application.

68.    Most of the time in this category was spent preparing and prosecuting a motion to establish a claims bar date, then implementing the resulting *Order Establishing Bar Dates for Filing Proofs of Prepetition Unsecured and Secured and § 503(b)(9) Administrative Expense Claims* [ECF No. 245].  Movant worked with GCG, the Committee, and the UST to develop a procedure under which notice of the last day for filing claims was provided to a broad swath of both known and potential creditors.  This task was made particularly challenging by the existence of hundreds of outstanding gift cards, which necessitated the publication of a notice of the bar date in a newspaper of nationwide circulation and the emailing of such notice to all addresses in the Debtors' database of former and current customers.  Establishing a bar date and providing proper notice thereof was an essential step of the Debtors' bankruptcy process which enabled the Debtors to propose the Plan with the knowledge that it would bind all creditors, including holders of unused gift cards.

69.    Additional time in this category was spent responding to inquiries by creditors (or their counsel) regarding the status of the bankruptcy case, the projected treatment of their claims, or the claims-filing process.  Such calls by creditors are an inevitable part of any bankruptcy case with a large creditor body, and responding to them professionally and knowledgably is essential to maintaining transparency and goodwill.  Additionally in this category, Movant assisted the Debtors with their analysis of claims with respect to their amount, secured status, and priority status.

## G.    Plan/Disclosure Statement

### Services Rendered During the Application Period

| Attorney | Hours | Rate | Value |
|---|---|---|---|
| HLA | 1.2 | $525.00 | $630.00 |
| CHG | 11 | $525.00 | $5,775.00 |
| HBM | 1.3 | $525.00 | $652.50 |

| | | | |
|---|---|---|---|
| APS | 106.1 | $435.00 | $46,153.50 |
| ESB | 189.00 | $395.00 | $74,655.00 |
| AFB | 18.1 | $325.00 | $5,882.50 |
| **TOTAL** | 326.7 | | $133,778.50 |

70.     As set forth in Exhibit G hereto, Movant expended 326.7 hours during the Application Period in this category, pertaining to the negotiation, drafting, solicitation, and confirmation of the Plan.

71.     The vast majority of time spent by Movant in this category occurred in June, July, and August 2017, after Movant had already exhausted its available fees under the Compensation Cap.  It is a source of professional pride that, despite not being able to seek compensation for its services, Movant worked diligently to achieve what is an all-too-infrequent occurrence in modern bankruptcy practice: the confirmation of a Chapter 11 plan.

72.     Movant and counsel for the Committee first worked out the general framework for the Plan, then moved on to drafting the Plan and the Disclosure Statement, of which Movant took responsibility for preparation of the initial drafts.  During the Application Period, Movant communicated regularly by email and phone with counsel to the Committee and exchanged numerous drafts of the documents.

73.     Movant also communicated regularly with the UST in an effort to resolve any issues, particularly in light of the Supreme Court's ruling in *Czyzewski v. Jevic Holding Corp.*, __ U.S. __, 137 S. Ct. 973 (2017).  At the end of the day, Movant was able to ensure that unbudgeted administrative expenses, if any, would be paid in accordance with statutory priority.

74.     In addition to preparing and seeking confirmation of the Plan, Movant navigated the numerous logistical hurdles involved with soliciting and confirming a Chapter 11 plan, conferring with the UST, the Committee, and GCG to craft procedures governing the confirmation process.  One of the most notable hurdles involved creation and implementation of

vote tabulation procedures that would ensure that each general unsecured creditor was able to

vote on the Plan based on the appropriate Debtor(s) against which such creditor held a claim.  In

numerous instances, a creditor filed duplicative claims against more than the one Debtor,

presumably based on the creditor's uncertainty as to which Debtor it held a claim against.

Moreover, certain creditors erroneously filed claims against Workshop, even though Workshop

conducted no business with third parties and had no creditors other than its prepetition secured

lender (who was not entitled to vote on the Plan).  Consequently, Movant devised voting

procedures and applicable notices that "defaulted" erroneously filed or duplicative claims to the

appropriate Debtor based on the Debtors' records; but in so doing, Movant strenuously avoided

infringing the substantive rights of affected creditors.[15]

75.     The vote tabulation procedures were supported by the Committee and, ultimately

approved by the Court over the limited objection of the UST, the Court having determined that

such procedures were appropriate under the circumstances of the Chapter 11 Cases. The Court

further approved the Debtors' proposed vote solicitation procedures, combined hearing on the

Plan and the Disclosure Statement, and the establishment of a limited bar date for the filing of

administrative expense claims accruing from the Petition Date through August 4, 2017  [ECF

No. 363].

76.     Movant's tireless efforts in this category were rewarded when, on August 30,

2017, the Court approved the Disclosure Statement and confirmed the Plan.  Along with

approval of the Plan and Disclosure Statement, the Court also approved the Debtors' proposed

notice to all creditors of (a) confirmation of the Plan and the Effective Date, and (b) a further

---

[15] The handful of general unsecured creditors that had filed claims against Workshop were provided clear,
advanced notice of the proposed vote tabulation procedures and an opportunity to object to same. No such
creditors lodged an objection.

administrative expense bar date for claims accruing from August 5, 2017 through the Effective

Date (the "**Post-Confirmation Notice**").

## H. Unsecured Creditors' Committee

### Services Rendered During the Application Period

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| HLA[16] | 2.7 | $525.00 | $1,417.50 |
| HLA | .9 | $408.00 | $367.50 |
| ESB | 15.5 | $395.00 | $6,122.50 |
| AFB | .1 | $325.00 | $32.50 |
| **TOTAL** | 19.2 | | $7,940.00 |

77.     As set forth in <u>Exhibit H</u> hereto, Movant expended 19.2 hours during the

Application Period in this category, pertaining in large part to communications between Movant

and the Committee.

78.     When the Chapter 11 Cases were commenced, Movant assisted both the UST and

prospective counsel to provide essential background of the Debtors' business and likely issues in

the Chapter 11 Cases.  Ever since the Committee was selected, it has been necessary for Movant

to remain in continual contact with the Committee's attorneys.  Most of Movant's work in this

category was expended drafting emails and participating in phone calls to the Committee's

counsel, keeping them abreast of any developments concerning the Debtors, seeking input on

strategic decisions, and negotiating compromises to any disputes that arose.  Movant's efforts

also included assisting the Debtors in responding to initial information requests propounded by

the Committee's counsel as they undertook their due diligence following their selection as

counsel.

---

[16]  At one point during the Application Period, a portion of the fees incurred by attorney Howard L.
Adelman in this category was erroneously billed at the reduced rate of $408 per hour rather than Mr.
Adelman's customary rate of $525 per hour.  In this table, the hours billed at each respective hourly rate
are set forth separately.

79.     Over the course of the Chapter 11 Cases, Movant communicated with counsel for the Committee on subjects such as:

- The prepetition business and dealings of the Debtors;

- The IP Sale;

- The Retail Store Closing Sales;

- Debtor-in-possession financing, including the DIP Financing Order;

- Professional retention, compensation, and reimbursement; and

- The Plan and the Disclosure Statement.

80.     Time billed in the Unsecured Creditors' Committee category does not reflect every communication with counsel for the Committee.  In many instances (and particularly with respect to the Debtors' collaboration with the Committee on the Plan), Movant's time was billed to the subject matter of the communication (e.g., Plan/Disclosure Statement) rather than the more general Unsecured Creditors' Committee category.

81.     Open and frequent communication between Movant and counsel for the Committee allowed the Debtors to act in the best interests of creditors and to defuse various "sticking points" that could have delayed the administration of the Chapter 11 Cases.

## V.     **STANDARDS FOR REVIEW OF APPLICATION**

82.     Section 330 of the Code describes the applicable standard for evaluating this Application.  As one bankruptcy court in this jurisdiction has stated:

Under Section 330 of the Bankruptcy Code, professionals applying for fees must demonstrate *in writing* that their services were (1) actual; (2) necessary; and (3) reasonable.  Once services have been performed, Bankruptcy Rule 2016 requires that:

A person seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting

forth a *detailed* statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested.

These detailed applications establish the "actual," while an accompanying narrative explanation of the "how" and "why" establishes the "necessary." The primary objective of any fee petition is to reveal sufficient data to enable the Court to determine whether the services rendered were reasonable, actual and necessary.

*Pettibone*, 74 B.R. at 301.

83.     While the bankruptcy court has wide discretion in reviewing a fee application, such authority must be dispensed "with great care and fairness," *Wildman*, 72 B.R. at 705, keeping in mind the overriding policy of "compensat[ing] attorneys and other professionals serving in a case under title 11 at the same rate as [they] would be compensated for performing comparable services other than in a case under title 11." H.R. Rep. No. 95-595, at 549 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6442.

84.     The bankruptcy court's analysis focuses on the benefits to the estate and the quality of legal services in the context of the case as a whole. In the words of one court of appeals:

[I]t is important for a court to maintain a sense of overall proportion, and not become enmeshed in a meticulous analysis of every detailed facet of the processional [sic] representation. It is easy to speculate in retrospect that the work could have been done in less time or with fewer attorneys or with an associate rather than a partner. On the other hand, it is also possible that [the debtor] would not have enjoyed the success it did had its counsel managed matters differently. Fee-cutting ideally should be tempered with a view towards the need for the services at the time they were rendered.

*In re Boston & Maine Corp.*, 776 F.2d 2, 10 (1st Cir. 1985); *see also In re Gluth Bros. Constr., Inc.*, 459 B.R. 351, 370 (Bankr. N.D. Ill. 2011) (fee determination "must be based on the circumstances at the time the services were performed, and not simply in hindsight"); *Spanjer Bros.*, 191 B.R. at 757 ("Section 330 does not authorize compensation only to professionals who

take successful actions.  To the contrary, if there was a reasonable chance of success which

outweighed the cost in pursuing the action, then fees relating thereto are compensable.").

85.    Section 330 of the Code provides that, in determining whether an attorney's fees

are reasonable:

> [t]he court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>     (A) the time spent on such services;
>     (B) the rates charged for such services;
>     (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>     (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>     (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>     (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

86.    Movant has endeavored to prepare this Application in accordance with the

standards and guidelines outlined in section 330 of the Code, Bankruptcy Rule 2014, Local Rule

5082-1, as well as the applicable caselaw, including *Pettibone* and *Wildman*:

  A.  Itemized Daily Entries.   Each of the categories reflected contains detailed entries

      listing the subject activity; the date; the time spent; the nature of the services

      rendered; and the purpose for same.  Explanations are included to inform the reader

      of the circumstances giving rise to the activity.

  B.  Telephone Conferences.  Telephone conferences are detailed with disclosure of the

      topic of discussion, as well as the person called and reason therefor.  Telephone

conferences are cost-beneficial to the estates as they often provide the most efficient way to address numerous matters.

C. <u>Meetings and Office Conferences</u>.  Movant spent considerable time in meetings and conferences as a means of performing the services required.  Where a meeting is described, the persons present and topics discussed are set forth.

D. <u>Drafting</u>.  Movant was frequently called upon to draft documents such as correspondences, contracts, motions, and orders.  The complexity of the matters and the numerous parties and competing interests involved often required many revisions, and occasionally made it necessary for one member of Movant to review and edit a document drafted by another member.

E. <u>Legal Research</u>.   While the members of Movant have devoted substantially all their professional careers to the practice of commercial law, bankruptcy, insolvency, and corporate reorganizations, legal research was required on numerous occasions over the course of the Chapter 11 Cases.  A lawyer who does not spend considerable time conducting legal research is doing a disservice to his client, and will soon find out that the rapidly evolving field of bankruptcy law has left him behind.  The Seventh Circuit has recognized the need, and indeed the requirement, of continual research and preparation by attorneys, even in their own specialized areas of concentration. *See Steinlauf v. Cont'l Ill. Corp. (In re Cont'l Ill. Sec. Litig.)*, 962 F.2d 566, 570 (7th Cir. 1992) ("No one carries the whole of federal securities law—not only the many detailed statutes and regulations but the thousands of decided cases—around in his head, and a lawyer who tries to respond to a motion or brief without conducting fresh research is courting sanctions or a malpractice suit.").

F.  <u>Minimum Time</u>.  Movant does not apply a uniform amount of time to any particular activity.  The time entries herein were kept on a tenth-of-an-hour basis.  Movant submits, however, that Chapter 11 bankruptcy cases do not lend themselves to meticulous timekeeping.  Occasionally, a lawyer's need to concentrate, the press of time, and the emotion and energy involved will interfere with the ability to keep time with exacting detail.  Great care has been exercised by each member of Movant to keep reasonably accurate time, and Movant asks this Court to bear in mind the "big picture" approach described by the First Circuit Court of Appeals in *Boston & Maine*, 776 F.2d at 10.

G.  <u>Lumping</u>. Movant has endeavored to avoid grouping a number of unrelated activities into the same time entry.  From time to time, however, in a case of such complexity, meetings or telephone conferences will involve the discussion of numerous topics and several telephone calls may be made to a number of parties in rapid succession on one or more topic areas.  The UST has recognized the need in such situations to combine related time entries, particularly where the combined entries do not exceed .5 hours.  *See DOJ Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330*, 28 C.F.R. pt. 58, app. A, at section (b)(4)(v).  The entries elaborately describe each activity by identifying the parties involved, the purpose of the activity, and in many cases, the necessity thereof.  Such grouping is unavoidable, but the detailed explanations herein provide additional description and delineation of the time spent.

## VI.    **<u>BILLING JUDGMENT AND AVOIDANCE OF DUPLICATION</u>**

87.     An implicit element of the compensation process under section 330 of the Code is the prudent exercise of "billing judgment." *Pettibone*, 74 B.R. at 303.  Attorneys must exercise billing judgment to avoid burdening the bankruptcy estate with compensation for duplicative services.

88.     Movant is a small firm, which almost by definition prevents any significant duplication of services.  Furthermore, whenever possible, Movant staffed its projects with a still smaller core team of attorneys already familiar with the Debtors and the latest developments in the Chapter 11 Cases.  Typically, a given task was assigned to a single attorney possessing the appropriate level of experience, to prevent an unnecessary overlap in representation.  When two attorneys were needed, they were only involved due to the great complexity of a given matter, the press of business, or if a member of the firm was handling a matter in some way connected with another member's activity.

89.     To the extent necessary and beneficial to the estates, intraoffice conferences occurred between partners of Movant of different seniority, or a partner and an associate.  The estates benefitted from such conferences because they permitted necessary tasks to be performed competently at the less-senior attorney's lower rate, while freeing the more-senior attorney to provide other needed services.  Such joint participation among attorneys of differing seniority, provided it is undertaken judiciously, results in better and more efficient representation.

90.     Practically speaking, a small firm such as Movant does not often have the luxury of having more than one attorney handle more than one particular task.  But at times, especially in Chapter 11 cases of this magnitude, certain problems require the collective judgment and experience of several attorneys, such as with the Plan and Disclosure Statement.  The detailed time entries submitted with this Application show that collaborative work among members of

Movant was kept to a minimum, where possible, and was used only when appropriate, and in fact generated cost benefits for the estates.

91.    The court in *Pettibone* identified "illustrative examples of the appropriate exercise of billing judgment in bankruptcy cases."  74 B.R. at 303.  Each of those examples is evident in the work performed by Movant, including:

A.  <u>Individual Responsibility for Tasks</u>.  For nearly every discrete undertaking throughout the Chapter 11 Cases—be it research, drafting, negotiation, a court appearance, or any other legal task—a single member of Movant performed the vast majority of the work and took responsibility for the outcome.  Intraoffice conferences and other collaboration only occurred when efficient and beneficial to the Debtors' estates.

B.  <u>Appropriate Level of Skill</u>.  Movant utilized the services of its most senior partners, Messrs. Adelman and Gettleman, only in those areas requiring the services of such experienced practitioners.  To take advantage of their lower billing rates, the vast majority of work performed in the Chapter 11 Cases was handled by less-senior partners such as Messrs. Buck and Silverman, or by their associates, Messrs. Brougham and Dwayne.

C.  <u>Legal Research</u>.  Whenever possible, legal research was performed by members of Movant with lower hourly rates to further reduce the amount of fees.  Movant does not seek reimbursement for fees for the use of legal research tools such as Westlaw and LexisNexis.

**VII.    QUALIFICATIONS OF MOVANT; PRECLUSION OF OTHER EMPLOYMENT DUE TO ACCEPTANCE OF THE CHAPTER 11 CASES; COST OF COMPARABLE SERVICES**

92.     Adelman & Gettleman, Ltd. was established in 1983 and has been listed in the

Martindale-Hubbell Bar Register of Preeminent Lawyers since approximately 1985.  Movant is

one of the few Chicago bankruptcy boutique firms recognized annually in Illinois Super

Lawyers, Illinois Leading Lawyers Network, Best Lawyers in America, and Chambers and

Partners.

93.     Over the course of the Chapter 11 Cases, Movant has brought to bear the

collective skill and experience of the following members of the firm:

- HOWARD L. ADELMAN (HLA) – Shareholder.  Mr. Adelman is a 1977 *cum
  laude* graduate of St. Louis University School of Law, and is licensed to practice
  in the states of Illinois and Missouri.  Upon his graduation from law school, Mr.
  Adelman was law clerk to the Honorable Robert G. Dowd, Chief Judge of the
  Missouri Court of Appeals, St. Louis District, and later became the Executive
  Judicial Assistant to the Missouri Court of Appeals, St. Louis District.

  In 1978, Mr. Adelman joined the firm of Schwartz, Cooper, Kolb & Gaynor, and
  was made a partner in 1981.  In 1983 Mr. Adelman formed the law firm of
  Adelman & Gettleman, Ltd. with Chad H. Gettleman. Since entering private
  practice in 1978, he has devoted his entire professional practice to areas of
  commercial litigation, bankruptcy, insolvency, and corporate reorganization.  He
  has participated in major bankruptcy cases since 1978 as counsel to debtors as
  well as serving as counsel to creditors' committees, financial institutions and
  other parties, has confirmed numerous plans of reorganization, and has tried and
  argued cases in the bankruptcy court and the United States district court.  He has
  appeared in the Seventh Circuit Court of Appeals on numerous occasions.

  Mr. Adelman has been listed for more than twenty years in Naifeh and Smith's
  "The Best Lawyers in America."  He has been chosen as one of America's
  Leading Lawyers for Business by Chambers USA, Chambers and Partners Legal
  Publishing, from 2004 through 2017.  He was chosen as one of the Top 10 Illinois
  Super Lawyers in 2012 through 2017, regardless of specialty, one of the Top 100
  Illinois Super Lawyers in 2006 through 2017, one of the Top 100 Commercial
  Bankruptcy Lawyers in Illinois by the Leading Lawyers Network in 2006 through
  2017, and one of the Top 10 Commercial Bankruptcy Lawyers in Illinois in 2017.

  In October of 1999, Mr. Adelman was appointed by Chief Justice William
  Rehnquist to serve as a member of the Judicial Conference Advisory Committee
  on the Federal Rules of Bankruptcy Procedure.  He served on the Advisory
  Committee from 1999 through 2005 through the implementation of BAPCPA.

Mr. Adelman is also a Fellow of the American College of Bankruptcy, as part of its Twelfth Class.

- <u>CHAD H. GETTLEMAN (CHG) – Shareholder</u>.  Mr. Gettleman is a 1976 graduate of Marquette University Law School and is licensed to practice in the states of Illinois and Wisconsin.  Upon graduation from college at the University of Illinois, Mr. Gettleman became a Certified Public Accountant.  Mr. Gettleman was formerly a staff attorney for the Division of Corporate Regulation, Branch of Reorganization, U.S. Securities & Exchange Commission, specializing in corporate reorganization.  Mr. Gettleman joined the SEC in 1976, where he served until 1979.

  In 1979, Mr. Gettleman became associated with the firm of Schwartz, Cooper, Kolb & Gaynor.  In 1981, he became associated with the firm of Richards & Ralph, Ltd.  In 1983, Mr. Gettleman formed the law firm of Adelman & Gettleman, Ltd. with Howard L. Adelman, both of whom remain the sole shareholder-principals of the firm.

  Mr. Gettleman has been involved in major bankruptcy cases since 1976 and has confirmed numerous plans of reorganization.  He has devoted his entire professional practice exclusively to the areas of commercial litigation, bankruptcy, insolvency, and corporate reorganization.

- <u>HENRY B. MERENS (HBM) – Partner</u>.  Since his admission to practice in 1981, Mr. Merens has concentrated in the areas of bankruptcy, real estate, civil litigation, and commercial transactions, and has had extensive experience in virtually all aspects of insolvency practice.  Mr. Merens has participated in numerous significant Chapter 11 cases, as counsel to debtors, creditors, creditors' committees, secured lenders, trustees and other parties.  As debtor's counsel, Mr. Merens has confirmed a number of Chapter 11 plans of reorganization and has successfully concluded multiple Chapter 11 liquidations involving going-concern sales of various business enterprises.  Mr. Merens has published several articles in the fields of bankruptcy and commercial practice, and has participated as a featured speaker at a seminar dealing with mortgage foreclosures in Illinois, speaking on the interplay of bankruptcy and the foreclosure process.  In April 2009, Mr. Merens participated in a panel discussion sponsored by the National Business Institute entitled "Bankruptcy Forum: What Judges and Trustees Want You to Know."  Mr. Merens covered the segment of the discussion concerning real estate issues in bankruptcy.  Mr. Merens has been selected by his peers to Illinois Super Lawyers multiple times.  Mr. Merens earned his B.A. degree at Trinity College and his J.D. degree at the Washington University School of Law.

- <u>BRAD A. BERISH (BAB) – Partner</u>.  Mr. Berish has been at the firm throughout his legal career, which began in 1989.  His practice areas of concentration are in bankruptcy, civil litigation, and commercial transactions, with extensive experience in virtually all aspects of debtor-creditor relationships.  He has

represented debtors (both businesses and individuals), secured lenders, creditors, bankruptcy trustees, creditors' committees, purchasers, sellers, and assignees for the benefit of creditors in reorganization and liquidation situations, and in bankruptcy cases in Illinois as well as throughout the United States. He has represented clients in diverse industries including banking, construction, food processing, insurance, legal, manufacturing, real estate, telecommunications, and trucking. Mr. Berish has handled or been involved in small, medium, and large bankruptcy cases; the large cases have included those of Armstrong World Holdings, Inc., Chemtura Corp., Enron Corp., Federal Mogul Corp., Kaiser Aluminum Corp., Kmart Corp., and USG Corp. Mr. Berish has been selected by his peers to Illinois Super Lawyers multiple times. Mr. Berish earned his J.D. degree from Emory University in 1989, and has a B.S. in accounting from Indiana University. Prior to law school, Mr. Berish practiced as a CPA for two years in both public and private accounting positions.

- ADAM P. SILVERMAN (APS) – Partner. Mr. Silverman graduated from the University of Illinois in 1993 after studying economics. From there, he earned his Master of Business Administration from DePaul University's Kellstadt Graduate School of Business in 1995. Concentrating in international business, Mr. Silverman earned his MBA in five academic quarters while working full-time. In 1998, Mr. Silverman graduated with honors from the Chicago Kent College of Law. During his studies there, Mr. Silverman was selected to be a judicial extern for the Honorable Joan B. Gottschall, U.S. District Judge for the Northern District of Illinois.

  Mr. Silverman joined Movant as a first-year associate in October 1998 and was elevated to partner in January 2004. In addition to practicing law with the firm, Mr. Silverman has co-authored a chapter in the Illinois Institute for Continuing Legal Education entitled "Representing the Secured Creditor and Adequate Protection" published in IICLE's Business Bankruptcy Practice handbook; guest lectured at the Chicago Bar Association and DePaul University; served a two year term as a member of the Bankruptcy Liaison Committee for the Northern District of Illinois; and been named as a "Rising Star" (2008, 2009, 2010) and "Super Lawyer" (2012 - 2017) by his peers as part of the Illinois Super Lawyers publication. In addition to Illinois, Mr. Silverman is licensed to practice law in the state of Arizona.

- ERICH S. BUCK (ESB) – Partner. Mr. Buck represents corporate and individual debtors and creditors in workouts, liquidations, reorganizations and commercial litigation. Erich is a 1997 graduate of Northwestern University and in 2001 graduated from the University of Iowa College of Law. While attending the University of Iowa, he served as Managing Editor of the Journal of Gender, Race & Justice. Upon graduating law school, Erich served two years as law clerk to the Honorable Carol A. Doyle of the United States Bankruptcy Court for the Northern District of Illinois. Prior to joining Movant, Erich was an associate at Reed Smith

LLP (formerly Sachnoff & Weaver, Ltd.), where his practice focused primarily on creditors' rights litigation.

Mr. Buck has been named a "Rising Star" in the Illinois Super Lawyers publication and an "Emerging Lawyer" in the Leading Lawyers publication. He has co-authored articles published in the Journal for Corporate Renewal and the American Bankruptcy Institute Journal. In November 2016, Erich participated in a CLE program sponsored by the Chicago Bar Association entitled "Commercial Bankruptcy Law: Current Trends and Cases," in which he served on a panel addressing various issues confronting practitioners in involuntary bankruptcy cases.

- <u>ALEXANDER F. BROUGHAM (AFB) – Associate</u>.  Mr. Brougham joined Movant in September 2012 and focuses his areas of practice in business bankruptcy, reorganization, and commercial litigation.  Mr. Brougham is a 2006 graduate of Colby College and in 2009 graduated from the Northeastern University School of Law.  Upon graduating from law school, Mr. Brougham served as law clerk to two bankruptcy judges in the United States Bankruptcy Court for the District of Massachusetts: first the Honorable Joel B. Rosenthal, then the Honorable Melvin S. Hoffman when Judge Rosenthal retired.  Mr. Brougham then served a one-year term as law clerk to the Honorable A. Benjamin Goldgar of the United States Bankruptcy Court for the Northern District of Illinois.  Mr. Brougham is licensed to practice law in the states of Illinois and Massachusetts.

- <u>NICHOLAS R. DWAYNE (NRD) – Associate</u>.  Mr. Dwayne joined Movant partway through the Application Period, in April 2017, and focuses his practice on business bankruptcy.  Mr. Dwayne graduated from Marquette University in 2007 and from the University of Illinois College of Law in 2012.

94.    The following is a summary of the legal services rendered by each of the

members of Movant during the Application Period:

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| HLA | 59.1 | $525 | $31,027.50 |
| HLA | .9 | $408 | $367.50 |
| CHG | 118.4 | $525 | $62,160.00 |
| HBM | 87.5 | $525 | $45,937.50 |
| BAB | 3.4 | $465 | $1,581.00 |
| APS | 215.10 | $435 | $93,568.50 |
| ESB | 875.50 | $395 | $345,822.50 |
| AFB | 321.7 | $325 | $104,552.50 |
| NRD | 2.4 | $315 | $756.00 |
| NRD | 30.6 | $295 | $9,027.00 |
| **TOTAL** | **1,714.6** | | **$694,800.00** |

95.     As a result of the acceptance of employment as counsel to the Debtors in these Chapter 11 Cases, Movant was precluded from rendering services in other substantial legal matters.  Since the commencement of the Chapter 11 Cases, members of Movant, particularly Messrs. Silverman, Buck, and Brougham, have spent a significant portion of their time on matters involving the Debtors.

96.     The hourly rates charged by Movant, which for the Application Period equate to a blended rate of approximately $405 per hour, are more than commensurate with the skill and expertise brought to bear on the duties and responsibilities of the Debtors, and are substantially less than the rates of many other bankruptcy practitioners of similar or even less experience in this District.

## VIII.   STATEMENT PURSUANT TO SECTIONS 329 AND 504 OF THE CODE AND BANKRUPTCY RULE 2016

97.     Except with respect to the sharing of compensation authorized under section 504(b) of the Code, Movant has not shared or agreed to share any award of fees received in connection with these Chapter 11 Cases with any person, firm, or entity.  There does not exist any agreement or understanding between Movant or its associates or employees, and any other person, firm, or entity, with respect to the sharing of compensation herein.

## IX.   NOTICE

98.     Notice of this Application has been given by CM/ECF and/or U.S. mail to: (i) the Office of the United States Trustee; (ii) the Debtors' CEO/CFO, Michael Smith; (iii) counsel for the Committee; (iv) counsel for Spin Master; (v) the Creditor Trustee, Amanda Demby; and (vi) all other parties who have filed requests for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

99.     Bankruptcy Rule 2002(a)(6) generally requires that notice of a hearing on an entity's request for compensation or reimbursement of expenses exceeding $1,000 must be provided to "the debtor, the trustee, all creditors and indenture trustees."  Fed. R. Bankr. P. 2002(a)(6).  The Court, however, is authorized to "enter orders designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent."  Fed. R. Bank. P. 2002(m).

100.     Furthermore, where an official committee of unsecured creditors has been appointed, Bankruptcy Rule 2002(i) authorizes a bankruptcy court to limit the notice required under Bankruptcy Rule 2002(a)(6) to the UST, the committee, and those who have filed requests for notice.  *See* Fed. R. Bank. P. 2002(i).

101.     Movant respectfully submits that cause exists to limit notice of this Application to the parties specified above.  Providing notice of this application to approximately one thousand creditors would unduly burden the Debtors' estates.  The key parties in interest in the Chapter 11 Cases – *i.e.*, those that have actively participated in the cases – are being served the Application. Further, all creditors did receive "inquiry notice" of the Application by way of the Post-Confirmation Notice, which informed creditors of the filing deadline for, and the hearing date on, all professional fee applications in the Chapter 11 Cases, which would include Movant's Application. Further information regarding the Application would therefore be available through the Debtors' website for the Chapter 11 Cases maintained by GCG, as well as by contacting Movant.

## X.     CONCLUSION AND REQUEST FOR ALLOWANCE AND PAYMENT OF FINAL COMPENSATION AND REIMBURSEMENT OF EXPENSES

102.     For the foregoing reasons, in consideration of the time and labor required and performed in these Chapter 11 Cases, the experience, reputation, and ability of Movant, and the

results achieved, Movant respectfully requests: (a) allowance on a final basis of all compensation

and expenses requested for the Application Period, such compensation and reimbursement

having been determined to be reasonable, actual, and necessary; (b) payment of $110,392.48

which is being held in trust by Movant pursuant to the Plan, representing the unpaid holdback

under the Payment Procedures Order which accrued during the Application Period; (d) limitation

of the notice of hearing on this Application; and (e) such other and further relief as is just.

Respectfully Submitted,

ADELMAN & GETTLEMAN, LTD.

By: /s/ Erich S. Buck
      Erich S. Buck

ADAM P. SILVERMAN, ESQ. (ARDC #6256676)
ERICH S. BUCK, ESQ. (ARDC #6274356)
ALEXANDER F. BROUGHAM, ESQ. (ARDC #6301515)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd, Suite 1050
Chicago, Illinois 60604
Tel. (312) 435-1050
Fax (312) 435-1059
**Counsel for the Debtors**